AMERICAN AIRLINES, INC., Plaintiff,

v.

AIR LINE PILOTS ASSOCIATION, IN-TERNATIONAL, an unincorporated association representing the Air Line Pilots in the service of American Airlines, Inc.; Clarence N. Sayen, individually and as President of Air Line Pilots Association, International; Charles C. Spencer, Jr., as Regional Vice President-Region I of The Air Line Pilots Association, International; Paul G. Atkins, individually, as Chairman of the American Airlines Master Executive Council of The Air Line Pilots Association, International, and as a member of Local Executive Council No. 22 of The Air Line Pilots Association, International; Wray A. Gillette and Daniel L. Hawley, individually, as members of the American Airlines Master Executive Council and as members of Local Executive Council No. 22; Richard F. McElhaney and Byron S. Cramblet, individually and as members of Local Executive Council No. 22; and Paul G. Atkins, Wray A. Gillette, Daniel L. Hawley, Richard F. McElhaney and Byron S. Cramblet, as representatives of a class, namely, all of the Air Line Pilots in the service of American Airlines, Inc., Defendants.

United States District Court
S. D. New York.

Dec. 12, 1958.

Debevoise, Plimpton & McLean, New York City, for plaintiff, Samuel E. Gates, Robert B. von Mehren, Louis H. Kurrelmeyer, New York City, of counsel.

Cohen & Weiss, New York City, for defendants, Henry Weiss, Donald S. Winograd, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

The plaintiff here is a major domestic air line operating nation-wide as a common carrier by air under certificates of the Civil Aeronautics Board. The principal defendant, The Air Line Pilots Association, International, is a labor organization representing all of the air line pilots in plaintiff's service. Also named as defendants are various officers, agents and representatives of the defendant Union, its committees and local, not all of whom have been served.

Plaintiff seeks (1) an injunction restraining the defendant Union and all of

its members from striking or causing any strikes or work stoppages against the plaintiff until the provisions of the Railway Labor Act as amended (45 U.S.C.A. § 151 et seq.) [1] have been fully complied with, and for such additional 30 day cooling-off periods as the Act provides; (2) judgment declaring that the defendants' acts in conditioning any new collective bargaining agreement between plaintiff and its pilots upon the manning of turbo-prop and jet aircraft at all flight stations by a qualified pilot are illegal and contrary to the requirements of the Railway Labor Act, and that plaintiff is under no obligation to bargain with its pilots as to such subject matter; and (3) judgment in damages against the defendants in the sum of $540,000 alleged to arise from threats made by the defendants to strike against the plaintiff, and for any additional damages which may arise as a result of an actual strike, upon the ground that such strike is illegal and wholly unjustified.

This action was precipitated by a strike call to all the plaintiff's pilots issued by the defendant Union on November 22 which was scheduled to start at 11:59 p. m. on November 25. However, the controversy between the plaintiff Airline and its pilots which led to the strike call is of long standing and commenced in June 1957 shortly prior to the scheduled expiration on August 24, 1957 of a collective bargaining agreement between the parties. Since that time there have been extensive proceedings between the Company and the Union under the Railway Labor Act, including numerous and protracted conferences, mediation by the National Mediation Board, proffer and refusal of arbitration, a report and recommendations by a Presidential Emergency Board. There were further negotiations and steps taken before the Mediation Board subsequent to the report of the Emergency Board. Despite all these efforts no agreement has been reached by the parties.

The controversies involved a new collective bargaining agreement covering rates of pay, rules and working conditions to replace that which expired on August 24, 1957 during the course of the Railway Labor Act proceedings. But the principal bone of contention on which efforts to effect an agreement foundered was the so-called piston-turbine issue. This involved basically the question of whether there should first be agreement on propeller aircraft (referred to as pistons) which the Company was then flying exclusively, and then on turbo-prop and jet aircraft (referred to as turbines) which it was acquiring in the relatively near future, or whether the agreement should include both types of equipment. I will discuss the details of this controversy later.

Plaintiff has moved for a preliminary injunction to restrain the strike of its pilots which was originally called for November 25, 1958, pending the hearing and determination of the action.

On November 24, 1958 the plaintiff applied to me for an order bringing on this motion and temporarily restraining the strike pending the hearing of its motion. Counsel for the defendant Union, having anticipated that such an application would be made, requested an opportunity to be heard thereon. Such opportunity was duly afforded. After argument before me by counsel for the Airlines and counsel for the defendant Union, which lasted several hours, I signed the order temporarily restraining the strike which had been called, until November 28, the return day of the motion for a preliminary injunction. On November 28 the temporary restraining order was extended pending the hearing of the motion, and after two days of argument on December 1 and 2 it was further extended pending the submission of additional affidavits and briefs by the parties and the determination of the motion.

There were substantial and difficult questions posed in the case, some of which were of first impression. Impor-

1. The Railway Labor Act was amended on April 10, 1936 to include carriers by air within its coverage. 45 U.S.C.A. §§ 181–188, ch. 166, 49 Stat. 1189.

tant public interests were involved, and there was manifest danger of irreparable injury and large economic loss both to the traveling public and to the plaintiff. The controversy had persisted for some eighteen months and it did not appear that any measurable harm could result to defendants if the strike were delayed for a short additional period. It was for these reasons that I determined to maintain the status quo pending resolution of questions posed by the motion for a preliminary injunction. See United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884.

The plaintiff contends that whereas it has consistently attempted to bargain in good faith with the defendant Union and has followed the steps and procedures required by the Railway Labor Act, the defendant Union has refused to bargain with it in good faith and has not complied with the Act as it was required to do. Plaintiff therefore urges that the strike which was called for November 25, 1958 was illegal, and, indeed, forbidden, under the Railway Labor Act, and that an injunction should issue out of this court restraining such strike until the Union has fully complied with the Act's requirements.

The defendant Union, on the other hand, contends that it has in good faith complied with the provisions of the Act, that it has in fact fully exhausted the procedures and remedies thereunder, and that in view of the deadlock which existed between itself and the plaintiff, the strike which it called was legal and proper. Moreover, it urges that there is nothing in the Railway Labor Act or otherwise which requires employees to refrain from striking while the procedures prescribed by the Act are being followed and that it had the right to strike regardless of whether it had complied with the Act or not. It urges further that in any event, and regardless of the circumstances, this court is without jurisdiction under the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., to enjoin a peaceful strike.

At the outset of the hearings before me the Union raised certain objections to jurisdiction over its person and certain technical objections to the issuance of the temporary restraining order. These objections were fully dealt with during the course of the lengthy argument before me and were overruled. They do not merit discussion here.

The Union also raised an objection to the maintenance of this action against it in this district on the ground of improper venue and moved to dismiss the complaint on this ground. This question remains to be disposed of before going to the main issues between the parties.

Defendant Union is an unincorporated association with its principal office in Chicago, Illinois. However, it has offices at 60 East 42nd Street, New York. Its regional vice president, Spencer, is in charge of such offices and makes his headquarters there. There are regular employees in the office and the Union's business is regularly transacted there. Meetings of the pilots are held and negotiations are conducted in these offices. Without going into further details it is apparent that the Union is present and doing business in this district and its representatives are acting for employees here. The Union raises no real issue as to this.

The Union contends, however, that, since it is an unincorporated association, venue may properly be laid against it under 28 U.S.C. § 1391 only in the judicial district where it "resides", that the place of such residence is the place where its principal office and place of business is, which is concededly in Chicago, Illinois, and that therefore venue may be properly laid against it only in the District of Illinois and not here.

Jurisdiction here is founded upon 28 U.S.C. §§ 1331, 1337 and 2201, basically because of federal questions affecting commerce arising under the Railway Labor Act.

28 U.S.C. § 1391, dealing with venue generally, provides:

"(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, except as otherwise provided by law.

"(c) A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes."

The cases are plainly in conflict as to whether the "residence" of an unincorporated association for venue purposes under 1391(b) is only in the district where it has its principal place of business or whether, like a corporation under Section 1391(c) such residence is in any judicial district where it is doing business. Brotherhood of Locomotive Firemen & Enginemen v. Graham, D.C.Cir. 84 U.S. App.D.C. 67, 175 F.2d 802, reversed on other grounds sub nom Graham v. Brotherhood of Locomotive Firemen & Enginemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22; Cherico v. Brotherhood of Railway Trainmen, D.C.S.D.N.Y., 167 F.Supp. 635; McNutt v. United Gas, Coke & Chemical Workers of America, C.I.O., D.C.W.D.Ark., 108 F.Supp. 871; Griffin v. Illinois Central R. Co., D.C.N.D.Ill., 88 F.Supp. 552; and Salvant v. Louisville & Nashville R. Co., D.C.N.D.Ky., 83 F.Supp. 391, hold that such residence for purposes of venue is confined to that of the association's principal place of business, which in this case would be Chicago.

Portsmouth Baseball Corp. v. Frick, D.C.S.D.N.Y., 132 F.Supp. 922, on the other hand, holds that, within the meaning of Section 1391, an unincorporated association resides in any district in which it does business. Under the Portsmouth case the residence of an unincorporated association is to be determined under the rules applicable to corporations. Since 1391(c) provides that the "residence" of a corporation for venue purposes is in any district in which it is doing business, an unincorporated asso-

ciation similarly is to be considered a resident of any district in which it is doing business for such purposes.

The reasoning of the Portsmouth case is in large measure based on Sperry Products, Inc. v. Association of American Railroads, 2 Cir., 132 F.2d 408, 145 A.L.R. 694, certiorari denied 319 U.S. 744, 63 S.Ct. 1031, 87 L.Ed. 1700. It states:

"Sperry Products v. Association of American R., 2 Cir., 132 F.2d 408, 145 A.L.R. 694, seems to me to hold that the rule for corporations holds for unincorporated associations. That case involved a question of venue of suit against an unincorporated association. Judge Learned Hand, for the court, 132 F.2d at page 411, came to the conclusion that, for venue purposes, those associations should be considered as jural entities, that the test for their location 'must always be what it is for a corporation outside the state of its incorporation' and that such an association is 'present' wherever any substantial part of its activities are carried on." 132 F.Supp. at pages 924-925.

This seems to me to be in accord with the practical realities. As Judge Learned Hand said in the Sperry case as to unincorporated associations (132 F.2d at page 411):

" * * * the test must always be what it is for a corporation outside the state of its incorporation. Indeed it is troublesome to see in what other way one can attribute location to such an association at all. It does not violate common understanding to think of a common venture or enterprise as having spatial position wherever any part of those activities take place by which it is realized. That is a practicable test and it is really the only practicable test."

Sperry arose prior to the enactment of Section 1391 in 1948, under the then patent venue statute (old Title 28 U.S.C. § 109) and not under the general venue statute (old Title 28 U.S.C. § 112). Sec-

tion 109 provided that patent infringement suits might be brought in any district of which defendant was an "inhabitant", or where defendant had a regular place of business and committed acts of infringement. At that time the general venue statute, Section 112, required that the defendant be an "inhabitant" of the district.

Judge Hand held that, for purposes of the patent venue statute, while an unincorporated association was "present wherever any substantial part of its activities were continuously carried on", nevertheless because of the two different venue requirements of Section 109 (inhabitance or presence plus infringement) the place where it was an "inhabitant" under that section could only be its principal place of business.

But it is plain from the Sperry case that under the general venue statute the word "inhabitant" meant the same thing when used with respect to an unincorporated association as it did when used with respect to a corporation. Cf. Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed. 2d 786.

Thus, when Section 1391 was enacted in 1948 and changed the venue requirement from "inhabitant" to "resident" it was already the law as laid down by Judge Hand that an unincorporated association should be treated for venue purposes in the same manner as a corporation. Indeed, as the Supreme Court has indicated, the passage of § 1391 was not intended to change the law in any respect. Fourco Glass Co. v. Transmirra Corp., supra. So also the revisers' notes to Section 1391 indicate.

The line of cases which diverge from Portsmouth all stem from Brotherhood of Locomotive Firemen v. Graham, supra. The Graham case also dealt with the predecessor statute to Section 1391 and mechanically, and in my view erroneously, applied Judge Hand's result under the patent venue statute in Sperry to the general venue statute, and held that an unincorporated association could only be sued under the latter statute at its principal place of business. Graham also misinterpreted the revisers' notes on Section 1391 in its own gratuitous footnote which assumed that the law with respect to the general venue statute prior to the 1948 revision had not assimilated unincorporated associations to corporations for purposes of venue as Sperry had held.

The cases following Graham have in my view perpetuated this error and I am in accord with the Portsmouth case.

The soundness of the rule of the Portsmouth case, at least in so far as it applies to labor organizations, is indicated by Section 301 of the Labor Management Relations Act of 1947, enacted prior to Section 1391, which liberalized jurisdiction and venue requirements in suits against them. 29 U.S.C.A. § 185.

Section 301 provides:

"(c) For the purposes of actions and proceedings by or against labor organizations in the district courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members."

It may well be that Section 301 applies to labor organizations generally in suits arising out of federal law. This is indicated by the limited application of subdivisions (a) and (b) of Section 301 as contrasted with the apparently unlimited application of subdivision (c). Nor is this view at all inconsistent with the legislative history of this section.[2]

But quite apart from this, Section 301 showed the mood of Congress with respect to suits against labor organizations arising under federal law at the time when Section 1391 was passed. Cf. Unit-

2. See: H.Minority Rep.No. 245, 80th Cong., 1st Sess. 108; H.Conference Rep. No. 510, 80th Cong., 1st Sess. 42, 66; Statement of Sen. Hatch, 93 Daily Congressional Record 5138.

ed States v. Hutcheson, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788.

The test of the Portsmouth case, or that of Section 301 furnish the only practical and realistic approaches to the problem of venue over labor organizations. To quote Justice Holmes, sitting on Circuit, in Johnson v. United States, 1 Cir., 163 F. 30, 32, 18 L.R.A.,N.S., 1194:

> "The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for the courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before."

I therefore hold that venue against the defendant Union is properly laid in this district and its motion to dismiss the complaint on the ground of improper venue is denied.

■ The Union also moved to dismiss the complaint and for a denial of the motion on the ground that under the Norris-LaGuardia Act this court has no jurisdiction to grant the injunctive relief sought. Since the complaint seeks relief by way of damages and declaratory judgment against the defendants as well as injunctive relief, the motion to dismiss the complaint on this ground is not well taken. Nevertheless the defendants' objection goes to the very heart of the court's jurisdiction to grant preliminary injunctive relief against strike. It must therefore be disposed of before proceeding to the merits.

The Union's position is that Norris-LaGuardia bars relief against a strike even though the Union had failed and, indeed, refused to comply with any requirements of the Railway Labor Act at all.

The plaintiff concedes that a union has full liberty to strike when the processes of the Railway Labor Act have been exhausted. It contends, however, that a strike prior to compliance with the Act by the union is illegal, forbidden and may be enjoined notwithstanding Norris-LaGuardia which it says has no application under such circumstances.

This brings us to consideration of the two Acts.

The Railway Labor Act (45 U.S.C.A. Chap. 8) has the purposes, among others, "(1) to avoid any interruption to commerce or to the operation of any carrier engaged therein * * * (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interruption or application of agreements covering rates of pay, rules, or working conditions". § 2(1).

In order to carry out these purposes the Act imposes a "duty" upon carriers and employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof". § 2, First.

Disputes between carriers and employees are divided into (1) minor disputes involving grievances and other differences arising under existing collective bargaining agreements, and (2) major disputes concerning issues as to rates of pay, rules and working conditions which are involved in reaching collective bargaining agreements. There is no doubt that the dispute in this case is a major dispute.

The procedure for handling the two is quite different. In the case of minor disputes the first step is negotiation and conference between the parties: If, however, the parties are unable to agree disputes may be referred by either or both to an Adjustment Board which determines the dispute after hearing the parties, and the awards of which are final and binding upon both parties to the dispute.

§ 3. Brotherhood of R. R. Trainmen v. Chicago River & Indiana R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622.

In the case of major disputes, however, while the Act also sets up detailed procedures which the parties are required to follow, none of these result in any final or binding determination, and the parties are under no compulsion to reach agreement at any point.

If either carrier or employees desire to make any change in the status quo with respect to conditions of employment, either under an existing collective bargaining agreement or in its absence, they must give "at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions". § 6.

Thereafter it is the duty of both parties under the mandate of Section 2 to confer and the Act directs that the time and place for the beginning of conference "*shall* be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice". (Emphasis supplied.) § 6.

If the conferences fail either party may invoke the services of the Mediation Board which "shall promptly put itself in communication with the parties" and "shall use its best efforts, by mediation, to bring them to agreement". If these efforts are unsuccessful the Board "as its final required action" (except as to the request for a Presidential Emergency Board) "*shall* at once endeavor * * * to induce the parties to submit their controversy to arbitration". (Emphasis supplied.) § 5, First. If both parties agree arbitration proceeds under § 7 and the resulting award is final and binding on the parties. If arbitration is refused, however, the Board "*shall*" notify the parties that its mediatory efforts have failed and "for thirty days thereafter, unless in the intervening period the parties agree to arbitration, or an emergency board shall be created under Section 10 of this Act, no change shall be made in the rates of pay, rules or working conditions or established practices in effect

prior to the time the dispute arose". (Emphasis supplied.) § 5, First.

Finally, after being notified by the Mediation Board that a dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation", the President may create a Board which "shall investigate promptly the facts as to the dispute and make a report thereon to the President within thirty days from the date of its creation". After the creation of the Board, and for thirty days after it has reported to the President "no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose". § 10.

Thus, the scheme provided by the Railway Labor Act for resolution of major disputes is clear and relatively simple. There is no compulsion on the parties to agree at any stage of the procedure. They are not compelled to reach an agreement by collective bargaining, to follow the recommendations of the Mediation Board, to submit to arbitration or to follow any recommendations which a Presidential Emergency Board may make.

But among the Act's prime features are the duties specifically imposed upon both carrier and union to attempt the settlement of any disputes which arise between them by collective bargaining between themselves, by mediation under the aegis of the National Mediation Board and, if it comes to that, to await the report and recommendations of a Presidential Emergency Board. Elgin Joliet & Eastern R. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886. As the Supreme Court said in footnote 12 to its opinion in that case (325 U.S. at page 721, 65 S.Ct. at page 1289):

"Thus, one of the statute's primary commands, judicially enforcible, is found in the repeated declaration of a duty upon all parties to a dispute to negotiate for its settlement. See Note 26; Virginian R. Co. v. System Federation, 300 U.S. 515, [57 S.Ct. 592, 81 L.Ed. 789];

cf. Switchmen's Union [of North America] v. National Mediation Board, 320 U.S. 297, 300, 320, [64 S.Ct. 95, 88 L.Ed. 61]; General Committee [of Adjustment of Brotherhood of Locomotive Engineers, etc.], v. M.-K.-T. R. Co., 320 U.S. 323, 331, 334, 64 S.Ct. 146, 88 L.Ed. 76. This duty is not merely perfunctory. Good faith exhaustion of the possibility of agreement is required to fulfill it. Cf. Virginian R. Co. v. System Federation, supra, [300 U.S.] at [pages] 548, 550, [57 S.Ct. at pages 599, 600]; [Brotherhood of Railroad] Trainmen, [Enterprise Lodge, No. 27], v. Toledo P. & W. R. Co., 321 U.S. 50, 56 ff., 64 S. Ct. 413, 88 L.Ed. 534. At successive stages of the statutory procedure other duties are imposed. Cf. §§ 5, First, (b), 6, 10."

Moreover, the Act provides three "freeze" or "cooling-off periods", (1) after the proceedings have been initiated by notice of change until the controversy has been finally acted on by the Mediation Board if it comes into the dispute, (2) for 30 days after mediatory efforts have failed, and (3) after an Emergency Board has been created, and for 30 days after its report. These cover the entire procedure which is required to be followed under the Act so that the parties are required to maintain the status quo with respect to the matters in controversy until 30 days after the processes of the Act have been exhausted.

Defendants contend, however, that, regardless of these provisions, the Norris-LaGuardia Act forbids the issuance of an injunction against a strike arising out of a railway labor dispute whether it takes place before or after the processes of the Railway Labor Act have been exhausted. Plaintiff, on the other hand, while conceding that there is an unqualified right to strike when the Act has been complied with, urges that the Norris-LaGuardia Act has no application to strikes which are commenced before there has been compliance with the provisions of the Railway Labor Act, and

that in fact such strikes are in violation of law and must be enjoined by the courts.

The Norris-LaGuardia Act, 29 U.S. C.A. § 101 et seq., passed in 1932, provides in Section 4:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute * * * from doing, whether singly or in concert, any of the following acts: (a) ceasing or refusing to perform any work or to remain in any relation of employment; * * *."

The cases on which the respective parties rely dealing with the question of whether the Norris-LaGuardia Act applies to situations arising out of the Railway Labor Act, do not pass directly upon the issue posed here.

The first of such cases is Virginian Railway Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789. There the carrier had refused to recognize the labor organizations certified by the National Mediation Board to represent its employees and had refused to treat with such organization. The district court issued a mandatory injunction which required the employer to recognize and treat with these bargaining representatives. The Supreme Court held that a mandatory injunction of this character was not precluded by the Norris-LaGuardia Act and that the injunction would properly lie. It went on to say (300 U.S. at page 563, 57 S.Ct. at page 607):

"It suffices to say that the Norris-LaGuardia Act can affect the present decree only so far as its provisions are found not to conflict with those of section 2, Ninth, of the Railway Labor Act, authorizing the relief which has been granted. Such provisions cannot be rendered nugatory by the earlier and more general

provisions of the Norris-LaGuardia Act."

Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283, Graham v. Brotherhood of Locomotive Firemen & Enginemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22, Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187, and Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S. Ct. 226, 89 L.Ed. 173, all involved the right of Negro railroad employees who had been refused representation by the Union because of their color to force the Union to represent them. It was held that the provisions of the Railway Labor Act, which impliedly forbade discrimination against employees on the grounds of race and color, took precedence over the more general provisions of the Norris-LaGuardia Act. An injunction therefore could properly be issued against the Union at the instance of the victim of such discrimination. As the court said in Brotherhood of Railway Trainmen v. Howard, supra, (343 U.S. at page 774, 72 S.Ct. at page 1025):

> "Our conclusion is that the District Court has jurisdiction and power to issue necessary injunctive orders [to enforce compliance with the requirements of the Railway Labor Act] notwithstanding the provisions of the Norris-LaGuardia Act."

Railroad Yardmasters of America v. Pennsylvania R. Co., 3 Cir., 224 F.2d 226, involved an injunction sought by a union against threatened acts of a carrier in violation of Sections 2 and 6 of the Railway Labor Act by making changes in wages, rules and working conditions without following the requirements of Section 6. It was held that such an injunction was not barred by the Norris-LaGuardia Act, the court stating (at page 228):

"If the union's contentions are correct, the effect of an injunction is to proscribe a threatened violation of the explicit command of the Railway Labor Act. Under such circumstances, it is clear that the prohibitions by the Norris-LaGuardia Act that injunctions in 'labor disputes' shall not issue, is not applicable." (Citing cases.)

While these cases plainly hold that the issuance of injunctions against actual or threatened violations of the Railway Labor Act are not necessarily barred by the provisions of the Norris-LaGuardia Act [3] they are not decisive on the question of whether a strike by a union which has refused compliance with the Railway Labor Act is barred by Norris-LaGuardia.

Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622, however, for the first time dealt directly with the question of whether the Norris-LaGuardia Act forbade issuance of an injunction against a strike which defeated the processes of the Railway Labor Act. There a "minor" dispute arising under the Railway Labor Act had been submitted by the carrier to the National Railroad Adjustment Board. The union promptly issued a strike call and the carrier obtained a permanent injunction against the strike. The Supreme Court held that the Norris-LaGuardia Act did not prevent the issuance of such an injunction. It pointed out that submission to the processes of the Adjustment Board for the settlement of minor disputes was compulsory on the parties and that awards of the Board were final and binding upon both of them. The court said (353 U.S. at page 40, 77 S.Ct. at page 640):

"We hold that the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes. There must be an accom-

---

3. See, also, General Committee [of Adjustment of Brotherhood of Locomotive Engineers] etc. v. Missouri-Kansas-Texas R. R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76; Rolfes v. Dwellingham, 8 Cir., 198 F.2d 591; Brotherhood of Rail- way & Steamship Clerks, etc. v. Railroad Retirement Board, 99 U.S.App.D.C. 217, 239 F.2d 37. Cf. Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 458, 77 S.Ct. 912, 1 L.Ed.2d 972.

modation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved. We think that the purposes of these Acts are reconcilable."

It went on to hold that the district court had the power to enjoin the strike notwithstanding the provisions of the Norris-LaGuardia Act since the injunction was necessary "to vindicate the processes of the Railway Labor Act".

While the holding of the Chicago River case was limited to "minor" disputes, it might be considered that the case was a long step toward the solution of the problem presented here were it not for a footnote of the court which reads as follows (353 U.S. at page 42, 77 S.Ct. at page 641):

"The Norris-LaGuardia Act has been held to prevent the issuance of an injunction in a railway labor case involving a 'major dispute.' Brotherhood of Railway Trainmen [Enterprise Lodge, No. 27] v. Toledo, P. & W. R. Co., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 524. In such a case, of course, the Railway Labor Act does not provide a process for a final decision like that of the Adjustment Board in a 'minor dispute' case."

Defendant urges that by this the Supreme Court meant to say that under no circumstances could an injunction issue in a railway labor case involving a major dispute. I cannot agree. The Toledo case cited in the footnote related to an injunction to prevent violence in a strike called after the processes of the Railway Labor Act had been fully exhausted. No breach of the Railway Labor Act was alleged or argued and the carrier did not base its application for injunctive relief upon any violation of the Act. The Supreme Court in Toledo held merely that the failure and refusal of the carrier to submit to voluntary arbitration under Section 5 of the Railway Labor Act barred it from injunctive relief under Section 8 of the Norris-LaGuardia Act. The case was concededly one to which the Norris-LaGuardia Act applied and turned on the question of whether the plaintiff, who relied on Norris-LaGuardia, met the requirements of its Section 8.

The Toledo case did not pass on the right to an injunction to vindicate the processes of the Railway Labor Act, nor did it remotely hold that the remedy of injunction is barred under Norris-LaGuardia in the case of total failure by a union to comply with the Act or to perform the duties imposed upon the union under it.

I take the footnote merely to mean that whereas in the case of minor disputes strikes are illegal *per se* because the processes of the Act are final, binding and conclusive throughout and therefore can be enjoined despite Norris-LaGuardia, in the case of a major dispute a strike is not illegal *per se* and cannot be enjoined if the processes of the Railway Labor Act have been complied with and exhausted.

While the question as to major disputes was not passed upon in the Chicago River case, the reasoning of that case as applied to the provisions of the Railway Labor Act involved here, leads me to the conclusion that an injunction against a strike called before there has been compliance with mandatory provisions of the Railway Labor Act looking toward the settlement of major disputes, can be enjoined pending such compliance notwithstanding Norris-LaGuardia.

█ In my view the Railway Labor Act imposes a mandatory duty upon both carrier and union to follow its procedures in the case of major disputes. While agreement is not compulsory the steps required by the Act are. In the event that either party refuses to follow them it has failed to follow the plain mandate of Congress and has breached the duty which Congress imposed upon it. Injunctive relief is required to "vindicate the processes of the Railway Labor Act" (Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. R. Co., supra, 353 U.S. at page 41, 77 S.Ct. at page 641) without which the Act would be a

nullity. If, as the Supreme Court said in the Chicago River case, the provisions of the Norris-LaGuardia Act and the Railway Labor Act must be accommodated "so that the obvious purpose in the enactment of each is preserved", it follows that a strike of a union which has refused to comply with its mandatory duties and to observe the freeze periods is illegal and can be enjoined by the courts notwithstanding the provisions of the Norris-LaGuardia Act.[4]

The ultimate right of the parties to use the economic pressures of strike or lockout is not in any way impaired by such a holding. The right is merely suspended pending the required use of the machinery provided by Congress for the orderly settlement of such disputes and the exhaustion of these mandatory procedures.

The history and background of the Railway Labor Act has been traced in a number of cases and it is not necessary to repeat it here. See General Committee of Adjustment of Brotherhood of Locomotive Engineers, etc. v. Missouri-Kansas-Texas R. Co., supra, 320 U.S. at page 328, 64 S.Ct. at page 148, et seq.; Elgin Joliet & Eastern R. R. Co. v. Burley, supra. The present Act was passed in 1926 and was substantially amended in 1934. At that time the compulsory machinery for settling minor disputes by the National Railroad Adjustment Board was set up and other amendments were made in the provisions relating to major disputes. In the meantime, in 1932 the Norris-LaGuardia Act had been passed. Thus Congress passed the Norris-LaGuardia Act with the 1926 provisions of the Railway Labor Act before it, and, in turn, placed additional requirements relating to major disputes in the Railway Labor Act in 1934 subsequent to the passage of Norris-LaGuardia.

Both sides rely heavily on the legislative history of the Railway Labor Act of 1926 and of the Norris-LaGuardia Act of 1932 to support their respective positions. Study of such legislative history, however, is not at all conclusive. There are indications which lend support to both viewpoints.[5]

However, Mr. Hawes, the House Reporter of the Act of 1926, and Senator Watson, its sponsor in the Senate, both indicated that the effect of the cooling-off period after the Emergency Board has been created, and for 30 days after it has made its report to the President, was intended to prevent strikes and lockouts during that period. As Mr. Hawes said during the Committee hearings [6]:

"Now, the public, of course, is interested in uninterrupted service, and I understand from both sides that the language of this bill is interpreted by them to mean that there shall not be a strike or a change of conditions until the emergency board appointed by the President in the last move has rendered its decision. So that both sides are on record that there will be no interruption of service at any time, from the first move until the final move, and it permits this to proceed even 60 days after this board appointed by the President has been in operation."

Senator Watson said with respect to the same subject matter [7]:

"Then, if all of these steps shall prove utterly futile, the board of mediation shall so notify the President of the United States; and if, in the opinion of the President, commerce is seriously threatened or the transportation system is likely to be seriously interrupted, then what happens? Then the President may

4. See Railway Express Agency, Inc. v. Local 808, International Brotherhood of Teamsters, D.C.S.D.N.Y., Civil No. 119-371, May 1, 1957 unreported, (strike during freeze period enjoined).

5. See 67 Cong.Rec. 4648, 4657, 8814, 69th Cong., 1st Sess.; 75 Cong.Rec. 5499, 5503, 5504, 5505, 72d Cong., 1st Sess.

6. 67 Cong.Rec. 4657, 69th Cong., 1st Sess.

7. 67 Cong.Rec. 8815, 69th Cong., 1st Sess.

appoint an emergency board of as many members as he may deem wise to appoint, as many as he thinks essential, to investigate the situation, and for 60 days the status quo shall be preserved; no strikes shall happen; no lockout shall occur; no trains shall stop. * * * ."

When it came to the passage of the Norris-LaGuardia Act, six years later, the statements of Congressman LaGuardia, the sponsor of the bill in the House, on this same subject are of some significance. He said in discussing a proposed amendment to exempt public utilities from the provisions of the Norris-La-Guardia Act [8]:

"So that there is a tie-up between the provisions of the railroad labor act and the necessity of exhausting every remedy to adjust any difference which might arise. The workers could not and would not think of going on strike before all the remedies provided in the law have been exhausted. If the railroads have complied, they would not, as has been suggested, be deprived of any relief which they may have in law or equity."

Thus, without being in any way conclusive, the legislative history tends to support the view that (1) it was contemplated in the original Railway Labor Act that the remedy of injunction against strikes and lockouts was not barred prior to the exhaustion of the procedures set forth in the Act, and (2) the Norris-LaGuardia Act did not contemplate precluding such injunctive relief.[9]

It may also be noted that, against the background of this legislative history, the 1934 amendments to the Railway Labor Act added the present freeze provisions of Section 5 providing. that there should be no change in "rates of pay, rules, or working conditions or *established practices* in effect prior to the time the dispute arose" (emphasis supplied), for thirty days after notice by the Mediation Board that its efforts to mediate the dispute have failed. This freeze provision covers the gap which formerly existed between the freeze provisions of Section 6 (during the period after negotiations had been initiated) and the freeze provisions of Section 10 (after the Emergency Board had been created and for thirty days after it rendered its report).

Thus Congress made freeze or cooling-off periods applicable throughout the full course of the procedures required by the Act. This would seem to have been an empty gesture had Congress thought that injunctive relief against strikes during these periods was barred.

I conclude, therefore, that the parties may not, in the course of a major dispute under the Railway Labor Act, have resort to either the strike or the lockout before the procedures provided by the Act have been exhausted and a strike or lockout during that period is illegal and forbidden by the Act. In the event of the failure of a union or of an employer to comply with the provisions of the Act such union or employer may be enjoined from strike or lockout notwithstanding the provisions of the Norris-LaGuardia Act.

8. 75 Cong.Rec. 5504, 72d Cong., 1st Sess. See, also, the following exchange between Representatives LaGuardia and Lankford during the House debates on the Norris-LaGuardia Act: (75 Cong.Rec. 5499, 72d Cong., 1st Sess.)

"Mr. Lankford: * * * Does this make it possible for lack of an injunction to tie up railroads and prevent them from transporting milk, for instance?"

* * * * * * *

"Mr. LaGuardia: [In 1926] we passed the railroad labor act, and that takes care of the whole labor situation pertaining to the railroads. They could not pos-

sibly come under this for the reason that we provided the machinery there for settling labor disputes."

* * * * * * *

"Mr. Lankford: It does not apply to the transportation of milk or other necessities that go in interstate commerce?"

"Mr. LaGuardia: Interstate traffic is entirely covered in the railroad labor act of 1926."

9. See, also, Frankfurter and Greene, The Labor Injunction (1930) p. 135 note; 2 Teller, Labor Disputes and Collective Bargaining (1940) p. 692.

■ This brings us to the basic question presented here which is whether or not on the record now before me plaintiff has established that the Union has failed to comply with the provisions of the Railway Labor Act, and whether it is therefore entitled to a preliminary injunction restraining the strike which the Union called.

In order to understand fully the issues presented on this phase of the case it is necessary to state in considerable detail the facts concerning the dealings between the parties and the steps taken under the Act as they appear from the papers now before me. These facts are as follows:

The Company and the Union entered into a collective bargaining agreement effective February 24, 1956, which provided that it should continue in force and effect until August 24, 1957 and should renew itself without change for successive yearly periods unless written notice of intended change were served in accordance with Section 6 of the Railway Labor Act by either party at least 60 days before August 24 in any year.

On June 21, 1957 the pilots served upon the Company, pursuant to the provisions of Section 6 of the Act, a notice of intention to change the provisions of the existing agreement known as an "opener". This notice dealt with various aspects of wages, hours and working conditions.

At that time the Company was operating exclusively propeller, or what are referred to as "piston" aircraft. However, the Company was in the process of acquiring both turbo-prop and jet aircraft, referred to as "turbine aircraft". Apparently the first deliveries of such aircraft were anticipated for the fall of 1958, with operations to commence in the late winter or early spring of 1959.

The notice of intended change served by the pilots, was confined exclusively to problems arising out of the operation of "piston" aircraft then being operated.

The Company also served an "opener" on June 21, 1957 dealing with similar subject matter in connection with piston aircraft but which the Company contended also dealt with various turbine aircraft problems. It was the position of the Company that such problems should be negotiated at the same time as the piston problems in view of the anticipated acquisition of jets and turbo-props and the entry of these aircraft into service in the future.

Conferences between the parties were held during the summer of 1957 with regard to their respective "openers". These discussions were largely limited to exchange of information and the procedures to be followed in the negotiations. At some time, however, (precisely when is not entirely clear) the question of whether negotiations should be confined to piston aircraft or should include turbines also became of importance. The pilots insisted that negotiations be confined to piston problems under their "opener". The Company, on the other hand, insisted that its "opener" embraced turbine as well as piston problems and took the position that it would not negotiate on piston problems unless jets were included.

Nevertheless, there was some discussion during the summer of 1957 of various problems of wages, hours and working conditions, though there was no orderly exchange of proposals and counterproposals. Finally, on August 7, 1957, a request for mediation was made by the pilots to the National Mediation Board under Section 5 of the Act. The Board docketed the case but suggested further direct negotiations between the parties before a mediator entered the dispute.

Pursuant to that suggestion meetings between the parties were then resumed in September, but the discussions foundered largely on the rock of the piston-turbine controversy.

A mediator designated by the National Mediation Board at the request of the pilots then met, first alternately with the parties, and then in joint sessions with them, over a period of some three weeks in an effort to compose their differences. During the mediation there was discussion of pay formulas, but again the

piston-turbine controversy was injected and no results were achieved.

In November 1957 the National Mediation Board proposed arbitration, pursuant to Section 5 of the Act. The pilots declined arbitration and the Company limited its consent to arbitrate to the question of compensation to be paid to the pilots. The Board therefore notified the parties on December 16, 1957, pursuant to Section 5, First (b) of the Railway Labor Act that:

"It is the judgment of our Board that all practical methods provided in the Railway Labor Act for our adjusting the dispute have been exhausted, without effecting a settlement.

"In these circumstances, notice is hereby served on behalf of the Board that its services (except as provided in Section 5, Third, and in Section 10 of the Law) have this day been terminated under the provisions of the Railway Labor Act."

Despite this notice, however, negotiations were resumed by the parties in January and February 1958 with the Chairman of the National Mediation Board and two of its mediators sitting in. Again discussions with respect to various pay plans and other matters foundered on the unwillingness of the Company to reach a piston agreement immediately effective without resolution of the turbine issues, and the pilots' equal insistence that the piston issues should be agreed on first.

On February 24, 1958 the Mediation Board again closed the case.

On April 8, 1958 the Union advised the Mediation Board that a strike had been set for April 16, 1958. The Board requested further mediation and postponement of the strike date. The strike was thereupon called off and the parties met in New York from April 16 to April 26, 1958, with the assistance of Mediation Board representatives.

These meetings culminated on April 25, 1958 in an agreement between the parties as to the basis for continuing negotiations. This agreement provided in substance that, after the problems of each of the parties connected with piston aircraft were resolved to their mutual satisfaction, the parties would begin negotiations immediately on rates of pay, rules, working conditions, and other related items with respect to turbo-prop and turbo-jet aircraft. Negotiations on piston aircraft were not to extend beyond May 28, 1958, and were to be based on specific proposals which were attached to the agreement. At the successful conclusion of the turbine negotiations the terms of such agreement were to be incorporated in one overall agreement including both. The pilots pledged that every effort would be made to conclude an agreement on turbine equipment prior to the time that the equipment was delivered to the Company.

In pursuance of this agreement the parties met in North Conway, New Hampshire, between May 1st and May 20th, 1958, with the assistance of mediators from the National Mediation Board. Again there were exchanges between the parties on questions of pay, working conditions and fringe benefits. Again any effective agreement on these problems was blocked by the recurrent dispute over pistons versus turbines. Meetings were resumed in New York between May 26 and June 6, with the same result.

Finally on June 19, 1958, upon notification by the National Mediation Board under Section 10 of the Act, an Emergency Board was created by the President.

On June 23, 1958, after the Emergency Board had been created, but before its proceedings had commenced, the pilots served upon the Company a second notice of intended change, this time covering turbine equipment. This is referred to as the pilots' "turbine equipment opener".

The Company immediately objected to this second notice, asserting that it was merely an effort to expand the scope of issues which had already been submitted to the Emergency Board by including items additional to those included in the notices of intended change of the re-

spective parties dated June 21, 1957, on which negotiations had been carried on for approximately a year.

On July 9, 1958 the Emergency Board began its hearings. At the outset the Company requested the Board to issue a ruling outlining the scope of the issues before it, that is to say, whether only piston aircraft or both piston and jet aircraft were involved. Nevertheless the Board conducted some twelve days of hearings on the merits between that date and August 5, 1958 which were devoted to part of the pilots' case.

On August 5, however, the hearings on the merits were interrupted and the Board directed the parties to proceed with evidence on the subject of whether or not jet aircraft issues were before it and heard such evidence.

On August 8, 1958 the Emergency Board submitted an interim ruling and proposals to the parties.

The Board stated that the piston-turbine issue was the heart of the present dispute and had been so since September 1957. In spite of revisions of offers upward and downward "most of the Company and Association efforts in mediation have been directed toward procedural resolution of the issue *which had become a substantive matter*" (emphasis supplied). After a review of the negotiations and the evidence with respect to the intent of the parties in their June 1957 "openers", the Board ruled:

"That the problems of turbine powered aircraft were not a part of this controversy as it developed from the Section 6 notices exchanged in June 1957. However, the Board is equally convinced that to proceed at this time on the piston issues only would be entirely unrealistic. Both parties must recognize that they are now confronted with unresolved issues relating to turbine equipment as well as piston equipment. These issues must be faced up to in their entirety if a firm collective bargaining agreement is to be achieved."

After pointing out that "There has been no real collective bargaining between the parties on the merits of any of the issues now confronting them", the Board went on to say that the case had come before it "in a status not contemplated by the Railway Labor Act". It recommended that the parties resume negotiations on the basis of the memorandum of understanding of April 25, 1958 "but with an acceptance that some of the issues on piston and turbine equipment are related".

Subsequent to the interim report of the Board, and pursuant to its recommendations, the parties again resumed negotiations. Pre-negotiation meetings were held with the Board Chairman on August 11 and 12 and negotiations were then continued until August 28. Frequent communication was had with the Chairman of the Board and a National Mediation Board mediator assisted.

During this period the Company made an offer of certain pay rises for piston aircraft. The pilots made proposals in clarification of their turbine opener of June 23, 1958, including proposals as to rules. Again the parties failed to agree.

Finally, on September 3, 1958 the Emergency Board rendered its report to the President in which it stated that neither the prior or subsequent negotiations of the parties had "reached a point of discussion in which the issues have a fair prospect of being resolved or even clarified". It concluded that "the observed performance does not appear to justify that this Board request a further extension of its life" and that "in the light of developments unique to this case, the Board concludes that a resumption of the hearings on the merits would not be warranted". The Board recommended that "the parties should resume negotiations in the constructive manner recommended by this report", after stating that it had "confidence in the ultimate capacity of the parties to resolve their differences by genuine collective bargaining".

Thereafter further negotiations were had between September 9 and October 1, with no conclusive results. Early in October the Company again requested the Board for mediation of the dispute and asked that the case be again docketed upon the theory that by its second notice of proposed change concerning jet aircraft of June 23, 1958, the Union had extended the dispute on the case as originally twice docketed. The pilots replied through the Board protesting this request and advising the Board that if the application were entertained they would withdraw from negotiation all issues contained in their June 23, 1958 turbine opener. The exchanges between the parties were becoming increasingly acrimonious.

Almost simultaneously with a meeting by the Company with the Chairman of the Mediation Board in Washington, which the pilots, though invited, did not attend, the pilots rescinded and withdrew their amended "opener" of June 23, 1958, and any proposals flowing therefrom. The Board then advised the Company that because of such withdrawal it declined to docket the dispute for mediation on the ground that nothing was before it which could be docketed.

On November 1, 1958 the Company filed a new "opener" notifying the pilots that it intended to change the existing rates of pay, rules and working conditions as of 30 days from the receipt of the notice. This notice covered rates of pay, rules and working conditions as to both pistons and turbines. On November 8 the pilots agreed to meet with the Company on November 26 but stated that this was without prejudice to their position "that the procedures of the Act had been exhausted in connection with our Section 6 notices of June 1957 leaving us free to activate a withdrawal from service at any time".

On November 22, 1958 the pilot Union called a strike for 11:59 a. m. on November 25, the day prior to their scheduled meeting with the Company. Some in-effective efforts to arrange a meeting with the Company in Chicago prior to that date were unsuccessful and the matter was in this posture when I issued the temporary restraining order of November 24, 1958.

The plaintiff on this preliminary motion has the burden of making a clear and convincing showing that the Union has failed to comply with the mandatory provisions of the Railway Labor Act. Such compliance cannot be merely perfunctory. "Good faith exhaustion of the possibility of agreement is required to fulfil it".[10] The question is whether the plaintiff has sustained its burden.

Here there is no doubt that the Union at least had gone through the procedural steps contemplated by the Act up to the time of the report of the Emergency Board on September 3, 1958. This is not a case where a party has refused to bargain with the other side at all or even to go through the motions of compliance with the Act. Cf. Virginian Railway Co. v. System Federation, supra; Yardmasters v. Pennsylvania R. Co., supra. Plaintiff does not base its argument on this motion primarily on a claim that defendants sought to bargain over an issue which is outside the scope of lawful collective bargaining. Cf. Douds v. International Longshoremen's Ass'n, Independent, D.C.S.D.N.Y., 147 F.Supp. 103, affirmed 2 Cir., 241 F.2d 478. The question is rather one of subjective intent, to be determined from the facts and circumstances.

There appear to be no helpful cases under the Railway Labor Act dealing with the standards that must be applied in such a situation.

However, somewhat analogous questions have frequently arisen under the provisions of Section 8 of the Labor Management Relations Act, 29 U.S.C.A. § 158 which make it an unfair labor practice for either employer or labor organization to refuse to bargain collectively in good faith. These cases arising under

---

10. Elgin Joliet & Eastern R. R. Co. v. Burley, 325 U.S. 711, footnote 12, 65 S.Ct. 1282, 89 L.Ed. 1886.

Section 8 indicate standards to determine whether the requirements of good faith bargaining have been fulfilled.

■ The requirement of good faith bargaining is really a requirement of absence of bad faith. In order to show such lack of good faith it is necessary to establish facts from which it can be reasonably inferred that a party enters upon a course of bargaining and pursues it with the desire or intent not to enter into an agreement at all.[11]

In N.L.R.B. v. Reed & Prince Mfg. Co., 1 Cir., 205 F.2d 131, certiorari denied 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391, the court upheld a National Labor Relations Board finding that the employer had committed an unfair labor practice by refusing to bargain in good faith. The court, per Magruder, Chief Judge, stated the standards to be followed in the following language (205 F.2d at pages 134–135):

"Thus if * * * [a party] can find nothing whatever to agree to * * * and makes not a single serious proposal meeting the [other party] at least part way, then certainly the Board must be able to conclude that this is at least some evidence of bad faith, that is, of a desire not to reach agreement * *. In other words, while the Board cannot force * * * [a party] * * to make a 'concession' on any specific issue or to adopt any particular position, the [party] * * * is obliged to make *some* reasonable effort in *some* direction to compose his differences * * * if § 8(a) (5) [the duty to bargain collectively] is to be read as imposing any substantial obligation at all * * *."

In N.L.R.B. v. United Clay Mines Corp., 6 Cir., 219 F.2d 120, 125 in reversing a N.L.R.B. finding that the employer was guilty of unfair labor practices by refusing to bargain in good faith, the court held that lack of good faith could be shown only by conduct *"clearly* showing an intent not to.,enter into a contract". (Emphasis supplied.) It said (at page 126):

"We find nothing in the Act which requires * * * [the abandonment of] a settled position on ,a certain issue because of either the quantity or quality of concessions * * *. It is not for * * * the Court to determine what in their opinion the respondent should have agreed to, and, in effect, make the contract for the parties. [The Board's order] would, as a practical matter, force the respondent to make a concession * · * *. While the Act compels negotiations, which usually result in reaching an agreement, it contains no authority to force an agreement where the parties have reached an impasse. [Citing cases.]"

In N.L.R.B. v. P. Lorillard Co., 6 Cir., 117 F.2d 921, reversed on other grounds 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380, the court denied enforcement of an order of the National Labor Relations Board based on a finding of lack of good faith bargaining on the part of an employer, stating (117 F.2d at page 924):

(1) "[A party] * * * is free frankly to state the terms upon which he may yield and those upon which he will not yield."

(2) "[A test under the statute] is the length of time involved in the negotiations and the persistence with which [the party] * * * offers opportunity for agreement."

(3) " * * * the record does not show that the respondent had a fixed resolve not to enter into an agreement."

The court concluded that the employer had not refused to bargain in good faith merely because "it stated in advance

11. As was pointed ,out by the Supreme Court in N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893, the National Labor Relations Act "does not compel agreements between employers and employees. It does not compel any agreement whatever".

certain terms to which it would not accede". (At page 924.) See, also, Singer Mfg. Co. v. N.L.R.B., 7 Cir., 119 F.2d 131, certiorari denied 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549; N.L.R.B. v. I.B.S. Mfg. Co., 5 Cir., 210 F.2d 634, holding in substance that the determinative factor on the issue of good faith bargaining was conduct clearly showing a wish to defeat rather than to reach agreement. See Cox, The Duty to Bargain in Good Faith, 71 Harvard Law Review 1401.

■ These are the standards which must be applied to determine whether plaintiff has met its burden here. Since this is an application for preliminary rather than final relief, however, the burden of the plaintiff goes no further than to show a reasonable probability of success on the issues of whether or not these standards were met. See Margolis v. Franks, D.C.S.D.N.Y., 138 F.Supp. 9; Bernstein v. Herren, D.C.S.D.N.Y.,. 136 F.Supp. 493; Davis Electronics Co. v. Channel Master Corp., D.C.S.D.N.Y., 116 F.Supp. 919; Heyman v. Ar. Winarick, Inc., D.C.S.D.N.Y., 166 F.Supp. 880.

■ Preliminary to consideration of the facts and circumstances bearing on this question, there is the problem of the effect to be given to the report of the Emergency Board.

It is the plaintiff's position that the court should disregard the detailed evidence submitted to it by affidavit regarding what occurred between June 1957 and the report of the Emergency Board on September 3, 1958, and begin afresh with the report of the Board, as if that report was an administrative adjudication binding on the parties as to all that had happened previously.

I see no basis for giving the report of the Board such significance. Under the Act the Emergency Board is charged with the sole duty of investigating the facts as to the controversy and reporting to the President with its recommendations. Such recommendations are not binding upon the parties who came before it or anyone else.

The Board did not conduct administrative hearings which are adjudicatory in nature or which are subject to judicial review under the Administrative Procedures Act, 5 U.S.C.A. § 1001 et seq. It was merely expressing its opinion as to the controversy and its recommendations as to possible means for its solution.

Even if the Board had concluded, which it did not, that the pilots had not been negotiating in good faith, or had in fact shown bad faith, in the negotiations, the court would not be bound by such a conclusion.

Were I to hold that the parties were bound by the so-called "findings" of the Board or its *recommendations* to the effect that they must commence renegotiations this would give to the Board's report an effect quite different from that contemplated by the statute. It would turn the Board's report and recommendations to the President, the prime purpose of which is to permit the marshalling of public opinion behind its recommendations into what would be in effect an award binding upon the parties. This would be contrary both to the letter of the statute and to the overall contemplation of the Act in terms of the lack of compulsion on the parties during any steps of the proceedings either (a) to agree among themselves or (b) to follow the recommendations of the mediators or the Presidential Board.

It should be noted that the problem with which the court is confronted here is not the same as that in passing upon an administrative determination of the National Labor Relations Board. Cf. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Here, since there has been no administrative determination, I must consider all the facts and circumstances before me relating to the conduct of the parties during the proceedings within the framework of the Railway Labor Act.

The following facts bear on the question of whether the pilots acted in good faith—that is to say, with a sincere desire to reach an agreement—or whether they acted in bad faith—that is, with the

affirmative intention not to reach an agreement.

1. At the time when the "openers" were served in June 1957 the only aircraft operated by the Company were piston aircraft. Operations of the new aircraft would not commence for 18 months or more thereafter.

2. The pilots' "opener" manifested their intention to negotiate on piston aircraft alone. The Emergency Board was of the view that after more than a year of negotiations and proceedings had elapsed, the Company's "opener" was also limited to piston aircraft, despite the Company's contention that their "opener" included both turbines and pistons. Not until after the hearings before the Emergency Board did the Company serve a new notice or amend their old one so as to make it plain beyond cavil that they intended to negotiate on both pistons and turbines.

3. The parties went through scores of meetings at which various aspects of wages, rules and working conditions concerning piston aircraft were discussed back and forth and a number of proposals were exchanged. Indeed, the parties almost reached an agreement on pistons, as counsel for the Airlines stated, before the Emergency Board. He said:

"I think I quote him (counsel for the pilots) correctly, in substance, when he said we almost got together on the pistons but it was because of the jets that we are here before you, and *that is exactly true. If it were not for the jets I don't think there would be any need for an Emergency Board.*" (Emphasis supplied.)

4. There is no doubt that the issue of whether an agreement should include both pistons and turbines, or should relate to pistons alone, was of paramount importance to both parties. They were not arguing about a mere procedural issue, as the plaintiff contends. This was a question of substance that went to the very heart of the negotiations. Unless one side or the other gave on this issue the negotiations were bound to founder but neither party saw fit to modify their position substantially. If the Company's position on the piston-turbine issue was in good faith then there is no reason to say that the pilots' position was not equally in good faith. On the other hand, if the pilots' position on the issue was in bad faith, there is no reason to find that the Company's position on the issue was not equally in bad faith.

But there is no question in my mind about the sincerity of both parties here in adhering to their respective positions. Each side was entitled to its own position, and if by negotiation, mediation and the other steps contemplated by the Railway Labor Act the deadlock could not be broken, there was no compulsion on either party to agree.

5. However, some progress was made on this issue by the agreement of the parties made on April 25, 1958, already discussed, in their provisions for continuing negotiations. This agreement was the result of protracted negotiations between the parties.

Negotiations carried on pursuant to this agreement foundered and an impasse was again reached because of the turbine-piston issue. It cannot be assumed that there was any more good faith or bad faith on the part of one protagonist than on the part of the other. Negotiations foundered because both parties were insistent on maintaining their respective positions, which they both believed were a crucial item in the negotiations.

6. The National Mediation Board itself found on at least three occasions, once in the fall of 1957, again in the late winter of 1957, and again subsequent to the negotiations following the April 25 agreement, that all of the processes of the Railway Labor Act except the calling of the Emergency Board, had been exhausted. Subsequent to the Emergency Board's report the National Mediation Board again pointed out that the controversy had been already twice docketed by the Board, and that the processes of the Railway Labor Act had been fully

exhausted on the dispute previously before them.

The Emergency Board was the last step for peaceful settlement of the dispute contemplated by the Railway Labor Act. It is true that the Board found that the situation before it was unique since the prime issue separating the parties was one relating to the subject matter of the discussion. As the Board stated, the case was not then in a posture contemplated by the Railway Labor Act.

But because of this there is no reason to say that the processes of the Railway Labor Act had not been substantially followed and that the parties had not come to the final impasse contemplated by the Act upon an issue of substance and of the utmost importance to both of them. That being so, once the Presidential Emergency Board acted there was no impediment on the right of the Union to strike after the expiration of the thirty day cooling-off period.

The Board's recommendations that the parties negotiate further on the basis of their April 25, 1958 agreement, and the findings of the Board that the turbine and piston issues were intertwined and interrelated were precatory.

It may be, as the Company claims, that there was some obligation on the part of the Union to bargain with respect to the Company's November 1, 1958 "opener". But that by no means prevented a strike with respect to the subject matter of the dispute which had been fully processed under the Railway Labor Act, on which the Emergency Board had acted, and concerning which the cooling-off period had expired.

To hold otherwise would mean that each new dispute on which the parties served appropriate "openers" would set in motion the machinery of the Railway Labor Act all over again with respect to a dispute in which the procedures of the Act had already been fully exhausted. Thus the right of the Union or the employer to use the economic pressures of strike or lockout which are forbidden only during a period when the parties have not fully performed their duties and obligations under the Act, could be postponed indefinitely.

The Union had a right, if it so desired, to insist upon an agreement regarding piston aircraft before negotiating with respect to turbine aircraft. Whether the pilots' position was right or wrong, wise or unwise, economically sound or unsound, are questions with which this court is not concerned. If the processes of the Railway Labor Act could not resolve these questions this court can certainly not resolve them, nor is it its function to do so.

Thus I do not draw from the facts with respect to the negotiations between the parties from early July 1957 until the report of the Presidential Board in September 1958, the somewhat sinister implications of bad faith which the plaintiff ascribes to the Union.

It may be noted that the Emergency Board did not reach such a conclusion either. It is true that its report states that there has been "no genuine collective bargaining" as to pay, rules and working conditions between the parties. But the report also points out that for a variety of reasons (including the failure of the Company to make it clear that its June 1957 "opener" included both pistons and turbines) the turbine-piston issue was a "roadblock" to the negotiations throughout and "had become a substantive issue".

Moreover, the Emergency Board, after stating that the case had reached them in a posture "not contemplated by the Railway Labor Act", resolved in its report and recommendations the very issue as to whether or not both turbines and jets were involved, which was the stumbling block between the parties. This is the very function which the Emergency Board is called upon to perform. While its report did not relate to agreement on pay, rules and working conditions, it did have the salutary effect of resolving a basic issue between the parties which was the key to the whole negotiation.

At this point, however, the procedures of the Railway Labor Act with respect to

the dispute had been fully exhausted and the compulsion upon the Union to refrain from striking came to an end on the expiration of the final freeze period. It had performed its duties and obligations under the Railway Labor Act. Thereafter there was nothing to bar a strike.

Thus I conclude that the plaintiff has failed to show that it has reasonable probability of establishing that the defendant Union did not in good faith comply with the provisions of the Railway Labor Act, which is a *sine qua non* of plaintiff's right to the preliminary relief which it seeks. Its application for a preliminary injunction must therefore be denied.

Since this is so it is unnecessary to pass on the Union's contention that the Company is barred from injunctive relief under Section 8 of the Norris-LaGuardia Act because of its refusal to submit any except limited issues to arbitration under Section 5 of the Railway Labor Act. Cf. Brotherhood of Railroad Trainmen Enterprise Lodge, No. 27 v. Toledo, P. & W. R. Co., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 524.

One further question remains. The Union has moved to dismiss the complaint on the ground that it appears from its face that it does not state a claim upon which relief can be granted. The basis of the motion is that the allegations of the complaint as to the proceedings by the Union under the Railway Labor Act show as a matter of law that the Act was sufficiently complied with. I cannot agree. As I have pointed out, the Act requires good faith exhaustion of the Railway Labor Act procedures. It is too well settled to require discussion that complaints in the federal courts will not be dismissed if there is any theory on which they can be sustained. Read in this light, the complaint, in my view, poses the question of whether there was good faith compliance on the part of the Union. It may well be that there are facts bearing on this question other than those which are now before me which may require a trial. This is quite apart from the fact that the complaint also seeks remedies by way of damages and declaratory judgment which are not before me. Defendants' motion to dismiss the complaint is therefore denied.

Plaintiff's motion for a preliminary injunction is denied at this time. Defendants' motion to dissolve the temporary restraining order heretofore issued is granted and the order is hereby vacated.

So ordered.