UNITED INDUSTRIAL WORKERS OF the SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, AT-LANTIC, GULF, LAKES AND IN-LAND WATERS DISTRICT, MARINE ALLIED WORKERS DIVISION, AFL-CIO, Appellant,

v.

BOARD OF TRUSTEES OF GALVES-TON WHARVES and the City of Galveston, Texas, Appellees.

BOARD OF TRUSTEES OF GALVES-TON WHARVES and the City of Galveston, Texas, Appellees,

v.

UNITED INDUSTRIAL WORKERS OF the SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, AT-LANTIC, GULF, LAKES AND IN-LAND WATERS DISTRICT, MARINE ALLIED WORKERS DIVISION, AFL-CIO, Appellant.

No. 25081.

United States Court of Appeals Fifth Circuit.

Aug. 8, 1968.

C. Paul Barker, New Orleans, La., Newton B. Schwartz, Houston, Tex., for appellant.

V. W. McLeod, Galveston, Tex., for appellees.

Before JONES, WISDOM, and THORNBERRY, Circuit Judges.

WISDOM, Circuit Judge:

This appeal is from an order of the district court (1) denying the backpay demand of the United Industrial Workers of the Seafarers International Union (Union) and (2) enjoining the Board of Trustees of the Galveston Wharves (Carrier) from availing itself of a state court injunction against the Union. The case presents a difficult problem of appropriate relief under the Railway Labor Act, 45 U.S.C. § 151 et seq., and involves the power of a federal court to enjoin state proceedings under 28 U.S.C. § 2283.

The Carrier and the Union operated under a collective bargaining agreement expiring September 30, 1964. July 31, 1964, the Carrier leased its jurisdictional facilities to the Port Richmond Elevator Company, resulting in the permanent lay-

off of 34 employees.[1] The Union sued under the Railway Labor Act §§ 2, 6, 45 U.S.C. §§ 152 Seventh, 156,[2] seeking an injunction against the Carrier's consummating the lease pending compliance with the Act's provisions and restoration of the status quo existing before the lease. The district court, viewing the dispute as a "minor dispute," relegated the Union to the Railway Adjustment Board for remedial relief. On appeal,[3] we held the dispute to be "major"[4] and remanded the case to the district court for imposition of "some suitable relief and sanction * * * so that bargaining about this operational termination, now so long delayed, may go forward." 351 F.2d at 191–92. We observed: "There is no pretense that § 6 was complied with. Under those circumstances the Union, and perhaps the National sovereign, became entitled to effective judicial relief to assure fulfillment of this national labor policy." 351 F.2d at 190.

On remand, the district court again relegated the Union to the Railway Adjustment Board for backpay, merely requiring the parties to bargain in good faith. Again, on appeal, we held that "this order did not provide the *suitable relief and sanction* that this Court found to be not only appropriate but necessary." United Industrial Workers, etc. v. Board of Trustees, 5 Cir. 1966, 368 F.2d 412, 413.[5] Again we remanded the proceedings, leaving details of relief "to the sound discretion of the District Judge."

On the second remand, the district court ordered the parties to bargain and enjoined the Carrier from seeking a state injunction against the Union. But for the third time, the court refused to grant backpay to the discharged employees.[6] The court asserted that there is no authority for a district court to make a backpay award; such an award may be made only by the duly authorized administrative agency, here the National Railroad Adjustment Board.[7]

1. The complete facts are set out in this Court's opinion, United Indus. Workers, etc. v. Board of Trustees, 5 Cir. 1965, 351 F.2d 184–86.

2. 45 U.S.C. § 152, Seventh reads:
   No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.
   The relevant portion of 45 U.S.C. § 156 is set out in our opinion below in part IB(4).

3. 351 F.2d 184.

4. The major-minor terminology was evolved in Elgin, Joliet & E. Ry. v. Burley, 1945, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886. See generally Rutland Ry. v. Brotherhood of Locomotive Engrs., 2 Cir. 1962, 307 F.2d 21; Comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 31 J.Air L. & Comm. 371 (1965).

5. We further stated:
   The District Court apparently mistook the breadth of the discretion afforded it for the existence of discretion, for the discretion granted the District Court was not whether to restore the status quo but only *how* to restore it. There must be an impact on the duty to bargain to prevent the employer from getting a windfall for having violated the Act, while protecting the employees' benefits against the lapse of time. While we did not foreclose the possibility that the lease might have to be unscrambled—a literal restoration of the status quo—we felt that something less could be substituted, so long as the employees were put substantially in the same position as if Galveston Wharves had complied with the Act. 368 F.2d at 413.

6. In a Memorandum and Order of March 20, 1967, the district judge required bargaining, ordered reinstatement of the laid-off employees, ordered backpay to be paid to those employees, and denied the Union's request for an injunction. Both parties filed various motions with the district court, and a supplemental hearing was granted. May 3, 1967, the district judge handed down the Memorandum and Order from which this appeal is taken.

7. The district court recognized that the mandate of this Court required "im-

On appeal, the Union contends that "suitable relief and sanction" can be imposed—and the status quo maintained—only by inclusion of a backpay award in the district court's judgment. The Carrier cross-appeals, contending that the district court was without power to enjoin the enforcement of a state court injunction against the Union. We affirm the issuance of the injunction, but reverse and remand on the backpay issue. We conclude that the district court has authority to require payment of backpay as a sanction for the Carrier's having violated Section 6 of the Railway Labor Act.

## I.

■■■ A. The district court correctly read the object of our prior mandates —"to impose such sanctions as are required to put the employees back in the same position as if the employer had complied with the Act, and to negate any windfall which the employer may have gained by the violation." The court felt, however, that its order requiring the Carrier to bargain and to reinstate the employees during bargaining constituted sufficient sanctions. We agree that the employer, having violated the Act, must now bargain with the Union and must reinstate the discharged employees *during bargaining;* we do not agree that these are "sufficient" sanctions.

(1) "The legislative history [of the Railway Labor Act] indicates that when the rail unions and carriers agreed upon these provisions, the unions surrendered their right to strike pending exhaustion of major dispute procedures in exchange for a statutory provision restraining management from disturbing the status quo."[8] Rutland Ry. v. Brotherhood of Locomotive Engrs., 2 Cir. 1962, 307 F.2d 21, 43 (Marshall, J., dissenting). These "freeze"[9] or "cooling-off"[10] provisions, "read together, cover the duration of major dispute proceedings":

> Under § 6 no change in rates of pay, rules, or working conditions can be made *by the carrier* from the time notice of an intended change has been given, or conferences with respect thereto have been begun, or the services of the Mediation Board have been requested or offered, until the controversy has finally been acted upon by the NMB, unless ten days elapse after the termination of conferences without a request for or proffer of NMB serv-

position of sanctions which directly inure to the benefit of the particular employees discharged," but it regarded the backpay issue as a "minor dispute," wholly within the jurisdiction of the Railroad Adjustment Board: Exclusive jurisdiction is vested by this Act in the Railroad Adjustment Board to initially determine matters which require the application of a bargaining agreement, as does the question of back wages here. * * * No one suggests that the finding by the Court of Appeals that a "major" dispute exists over the leasing of the elevator precludes there also being a "minor" dispute between the same parties involving different subject matter. * * * Plaintiff's effort to recover back wages and benefits here is clearly a claim to "rights accrued" and, therefore, a minor dispute relegated to the Railroad Adjustment Board under the Railway Labor Act as interpreted in Elgin, Joliet & E. Ry. v. Burley, 1945, 325 U.S. 711, 722, 65 S.Ct. 1282, 89 L.Ed. 1886, 1887.

8. The object of Section 6
   is to maintain the status quo, pending the expiration of the period provided by the section for allowing the process of negotiation, mediation and conciliation to have play. It is to prevent changes being made until these processes have been exhausted or the prescribed waiting period has expired without bringing them into effect. Order of Ry. Conductors v. Pitney, 1946, 326 U.S. 561, 569–70, 66 S.Ct. 322, 326, 90 L.Ed. 318, 324–25 (dissenting opinion).
   On the maintenance of the status quo pending Adjustment Board resolution of *minor* disputes see Westchester Lodge 2186 v. Railway Express Agency, 2 Cir. 1964, 329 F.2d 748, 752–53.

9. Chicago, R. I. & Pac. Ry. v. Switchmen's Union, 2 Cir. 1961, 292 F.2d 61, 66.

10. 67 Cong.Rec. 4648, 4650.

ices. If after the NMB has entered the dispute the parties fail to come to an agreement and arbitration is refused, § 5 First provides that for thirty days after notification by the NMB that its efforts have failed "no change shall be made in rates or pay, rules, or working conditions or established practices in effect prior to the time the dispute arose," unless during that period the parties agree to arbitration or an emergency board is created. Section 10 provides that from the time an emergency board is created until thirty days after the board makes its report to the President "no change, except by agreement, shall be made *by the parties to the controversy* in the conditions out of which the dispute arose." (Emphasis added.) Comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 60 Colum.L.Rev. 381, 388 n. 50 (1960).

Literally, of course, maintenance of the status quo in the instant case would have required a return to operation of the elevator by the Carrier. However, feeling that the employees involved in this major dispute could be adequately protected with less, we suggested that "we need not direct that the lease be unscrambled at this time." [11] 351 F.2d at 191. The first step in returning to the status quo is required bargaining between the parties. Brotherhood of R.R. Trainmen v. Chicago River & Ind. R.R., 1957, 353 U.S. 30, 33, 77 S.Ct. 635, 636, 1 L.Ed.2d 622, 625. The purposes of the Act point unequivocally in this direction; in both minor and major matters, the Act is designed "to provide for the prompt and orderly settlement of all disputes." 45 U.S.C. § 151a. "In both types of disputes the Act requires that, as a first step, the parties must make every reasonable effort to settle their differences in conference. § 2 First, Second * * 45 U.S.C.A. § 152 First, Second." Rutland Ry. Corp. v. Brotherhood of Locomotive Engrs., 307 F.2d at 31. "Thus, one of the statute's primary commands, judicially enforceable, is found in the repeated declaration of a duty upon all parties to a dispute to negotiate for its settlement. * * * Virginian R. Co. v. System Federation, R.E.D. [1937] 300 U.S. 515, 57 S.Ct. 592, 91 L.Ed. 789; cf. Switchmen's Union of N. A. v. National Mediation Bd. [1943], 320 U.S. 297, 300, 320, 64 S.Ct. 95, 96, 88 L.Ed. 61, 63, 74; General Committee of Adjustment, B. L. E. v. M-K-T R. Co. [1943], 320 U.S. 323, 331, 334, 64 S.Ct. 146, 150, 88 L.Ed. 76, 81, 82;" Elgin, Joliet & E. Ry. v. Burley, 325 U.S. at 721 n. 12, 65 S.Ct. at 1289 n. 12, 89 L.Ed. at 1893 n. 12.[12] It is therefore understood that, as the district court ordered, "both sides are to proceed in good faith to bargain as provided under the 'major disputes' provision of the Railway Labor Act." Memorandum & Order of the district court, March 20, 1967.

(2) But for the unilateral change of "working conditions" by the Carrier through the leasing of the elevator facilities, the Carrier-employee relationship would have continued throughout the bargaining period. Thus, maintenance of the status quo requires reinstatement of

---

11. Of course, this Court has the power to require that the lease be unscrambled and that the terminated operations be resumed. See the cases arising under the National Labor Relations Act, discussed in Forkosch, A Treatise on Labor Law §§ 435, 525 (1965).

12. As stated in Virginian Ry. v. System Federation No. 40, 1937, 300 U.S. 515, 548, 57 S.Ct. 592, 599, 81 L.Ed. 789, 799: The statute does not undertake to compel agreement between the employer and employees, but it does command those preliminary steps without which no agreement can be reached. It at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort to compose differences—in short, to enter into a negotiation for the settlement of labor disputes * * *.

Accord, Brotherhood of Ry. & Steamship Clerks v. Association for the Benefit of Non-Contract Employees, 1965, 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed. 2d 133.

the discharged employees during the bargaining period.[13] This the district court also ordered.

[3] B. The principal dispute in this case focuses on whether the thirty-four employees laid off should receive backpay for the period between their discharge and commencement of bargaining. The parties have cited, and we have found, no cases dealing with this precise problem. The district court concluded that "the finding by this Court of Appeals that a 'major' dispute exists over the leasing of the elevator" does not preclude "there also being a 'minor' dispute between the same parties involving different subject matter." "Plaintiff's effort to recover back wages and benefits here is clearly a claim to 'rights accrued'[14] and, therefore, a minor dispute relegated to the Railroad Adjustment Board. * * * " The court went on to suggest that "this Court is without jurisdiction to award back wages and benefits which may have accrued under the agreement." We disagree.

(1) The court below suggested that "jurisdiction to make the initial determination as to what back wages and benefits are due under the Agreement is vested solely in the Railroad Adjustment Board by the Railway Labor Act." Moreover, the district court concluded that payment of backpay was not a "sanction" ordered by this Court on the earlier appeals. As we have noted, however, the purpose of the relevant sections of the Act is maintenance of the status quo pending conference. The employees wrongfully laid off cannot be retroactively reinstated, but they can be retroactively compensated. This does not punish the Carrier. Nor does it constitute

a windfall to the employees. It is the price of reconstructing the status quo; it compensates the employees for the losses incurred by their being laid off in violation of the Act.

To this extent, the remedy is similar to that imposed by statute, the National Labor Relations Act, when employees have been discharged following the employer's refusal to bargain in violation of that Act. Thus, in NLRB v. Winn-Dixie Stores, Inc., 5 Cir. 1966, 361 F.2d 512, the Company discontinued certain operations—resulting in the lay-off of six employees—without prior bargaining with the Union. Although this Court refused to require the Company to bargain with the Union over re-establishment of the discontinued operations, we enforced the Board's order requiring the Company to make the discharged employees "whole for any loss of pay suffered by them." 361 F.2d at 515. Accordingly, the order provided that

> the back pay liability should cease upon the occurrence of any of the following conditions: "(1) reaching mutual agreement with the Union relating to the subjects which Respondent is herein required to bargain about; (2) bargaining to a *bona fide* impasse; (3) the failure of the Union to commence negotiations within 5 days of the receipt of the Respondent's notice of its desire to bargain with the Union; (4) the failure of the Union to bargain thereafter in good faith." 361 F.2d at 515 n. 6.

Similarly, in NLRB v. American Mfg. Co., 5 Cir. 1965, 351 F.2d 74, the Company discontinued trucking operations without bargaining with the Union. The Board ordered not only reinstatement and

---

13. On reinstatement during bargaining pursuant to an order arising under the National Labor Relations Act see M. Forkosch, A Treatise on Labor Law § 522 (1965); 31 Am.Jur., Labor § 306 (1958).

14. The term "rights accrued" originated in this context in Elgin, Joliet & E. Ry. v. Burley, 1945, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886, 1894.

The Court characterized "major" disputes as relating "to disputes over the formation of collective agreements or efforts to secure them," and "minor" disputes as being "founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement * * *. [T]he claim is to rights accrued, not merely to have new ones created for the future."

backpay, but resumption of the trucking operations. This Court observed that "[s]ince we order back pay and reinstatement of the employees, the Union has persons to bargain for. It does not need trucks to bargain for the men." 351 F.2d at 80–81. We did enforce that portion of the Board's order requiring the Company to "[o]ffer reinstatement to all discharged drivers to their former or substantially equivalent positions; and * * * [p]ay drivers back pay from the date of discharge with interest at 6 percent per annum." 351 F.2d at 76. See also Town & Country Mfg. Co. v. NLRB, 5 Cir. 1963, 316 F.2d 846.

Both parties and the district court devote considerable discussion to the M-K-T case, Brotherhood of Locomotive Engrs. v. Missouri-Kansas-Texas R.R., 1960, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379. In *M-K-T* the district court granted an employer-requested injunction against a union strike over a minor dispute. But the court conditioned this injunction upon the employer's maintenance of the status quo pending resolution of the dispute by the Adjustment Board or, alternatively, payment of the affected employees if the contested changes were put into effect prior to the Board's determination. Under the Railway Labor Act an employee strike in breach of contract, a minor dispute, is enjoinable; the adjustment provisions of the statute constitute "compulsory arbitration." Brotherhood of R.R. Trainmen v. Chicago River & Ind. R.R., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622. The Court realized the serious dislocation of employees that would occur, were the Carrier to put the changes sought into effect. The Court concluded that despite the patent illegality of the employees' strike threat, it could as a matter of equity condition the use of its injunctive powers against the employees on employer maintenance of the status quo *or the interim payment of the employees.* The court of appeals reversed.[15] The Supreme Court

reversed th court of appeals and endorsed the position of the district court. The lesson M-K-T teaches is that in a minor dispute situation, when the statute says nothing about maintenance of the status quo, the status quo may be maintained by freezing the conditions sought to be changed by the Carrier *or by allowing the change but requiring the Carrier to continue to pay the affected employees.* We observe, first, that the case before us involves a *major* dispute. The Act explicitly mandates maintenance of the status quo. Second, the facilities involved here have already been leased, and we have already determined that the lease should not be unscrambled; therefore, the only fair and practicable remedy is payment of the affected employees. This is what we meant when, in footnotes to our earlier opinions, we referred to "the interim wage plan approved" in M-K-T.[16]

Backpay is a realistic assurance that there will be "an impact on the duty to bargain to prevent the employer from getting a windfall from having violated the Act, while protecting the employees' benefits against the lapse of time." 368 F.2d at 413. Only backpay will put the employees "substantially in the same position as if Galveston Wharves had complied with the Act." Ibid.

(2) The Carrier's argument against a court-ordered backpay award is two-pronged: First, so the argument goes, the Railroad Adjustment Board has jurisdiction over the backpay award; second, the federal courts are without jurisdiction when such award is involved. We find both assertions erroneous.

■ The Carrier's error stems from its premise that "[i]f the members of this Union are entitled to back pay, it is because they were wrongfully discharged." The Carrier cites cases holding that in the absence of diversity of citizenship federal courts have no jurisdiction to order backpay for wrongful

---

15. Brotherhood of Locomotive Engrs. v. Missouri-Kansas-Texas R. R., 5 Cir. 1959, 266 F.2d 335.

16. 351 F.2d at 192, n. 29; 368 F.2d at 413 n. 3.

discharges *arising out of minor disputes.*[17] The court below also treated the backpay issue as constituting a "minor dispute." We acknowledge that a disciplinary discharge in *breach of contract* is remediable either before the appropriate adjustment board or, upon the employee's election, in a damage action[18] where permissible under state law in state or, if diversity exists, in federal courts. But the employees here do *not* claim backpay for a breach of contract. Their claim arises out of a violation of the federal statute. The contract-dispute cases therefore are not relevant.

██ The National Railroad Adjustment Board does not have jurisdiction over the backpay issue. In their contract the parties before us provided for a system board of adjustment in accordance with § 3, Second of the Railway Labor Act.[19] The system board, not the National Board, would have exclusive jurisdiction were a minor dispute involved. Sigfred v. Pan American World Airways, 5 Cir. 1956, 230 F.2d 13, cert. denied, 351 U.S. 925, 76 S.Ct. 782, 100 L.Ed. 1455; Primakow v. Railway Express Agency, D.C.Wis.1943, 56 F.Supp. 413; see International Ass'n of Machinists, AFL–CIO v. Central Airlines, Inc., 1963, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67.[20] But a minor dispute is not involved.

This is not a grievance dispute, nor a matter of interpretation or application of a collective bargaining agreement. These are the issues over which the Adjustment Board has exclusive jurisdiction under the terms of the statute.[21] See Gunther v. San Diego & Ariz. E. Ry., 1965, 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed. 2d 308; International Ass'n of Machinists, AFL–CIO v. Central Airlines, supra; Slocum v. Delaware, L. & W. R.R., 1950, 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795; United R.R. Operating Crafts v. Northern Pac. Ry., 9 Cir. 1953, 208 F.2d 135, 137, cert. denied, 347 U.S. 929, 74 S.Ct. 529, 98 L.Ed. 1081.

Admittedly, no case has been found where a federal court has awarded backpay as part of its enforcement of the status quo in a major dispute. But given our role in such enforcement, and the peculiar necessity for inclusion of backpay as a sanction under the Act (see part (1) above), we conclude that the Court possesses the power to include a backpay award in its order.

(3) We do not deny the particular competency of the administrative board in such proceedings.[22] But court and administrative decisions in backpay cases set out sufficient guidelines to chart our course in these waters.

17. E. g. Walker v. Southern Ry., 1966, 385 U.S. 196, 87 S.Ct. 365, 17 L.Ed.2d 294; Slocum v. Delaware, Lackawanna & W. R. R., 1950, 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795; United R. R. Operating Crafts v. Northern Pac. Ry., 9 Cir. 1953, 208 F.2d 135; Buster v. Chicago, M., St. P. & P. Ry., 7 Cir. 1952, 195 F.2d 73.

18. Walker v. Southern Ry., 1966, 385 U.S. 196, 87 S.Ct. 365, 17 L.Ed.2d 294; Moore v. Illinois Central R. R., 1941, 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089. See also Rose, The Railway Labor Act and the Jurisdiction of the Courts, 8 Labor L.J. 9 (1957); Note, 15 Ala.L.Rev. 625 (1963).

19. See Article X of the contract, providing for a system board pursuant to authority granted in 45 U.S.C. § 153.

20. On system boards in general see Kroner, Minor Disputes Under the Railway Labor Act: A Critical Appraisal, 37 N.Y.U.L.Rev. 41, 72–74 (1962).

21. "The disputes between an employee or group of employees and a carrier or carriers *growing out of grievances or out of the interpretation or application of agreements* concerning rates of pay, rules, or working conditions * * * may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board * * *." 45 U.S.C. § 153, first (i).

22. See Gunther v. San Diego & Ariz. E. Ry., 1965, 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308; Slocum v. Delaware, Lackawanna & W. R. R., 1950, 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795. See generally Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency, 46 Yale L.J. 567 (1937).

■■ Since this case is unusual in that it involves court-ordered backpay as a sanction for violation of the Railway Labor Act, we believe it desirable to set out some basic guidelines for the computation of the award. The obvious touchstone is the procedure used by the National Labor Relations Board: Backpay is comprised of the gross earnings which the discharged employee would normally have received during the applicable period[23] less any net interim earnings computed on a quarterly basis with interest.[24] See NLRB v. Charley Toppino & Sons, 5 Cir. 1966, 358 F.2d 94. Of course, a discharged employee is under a duty to make a reasonable effort to secure interim employment to mitigate the damages resulting from his unlawful discharge. Phelps Dodge Corp. v. NLRB, 1941, 313 U.S. 177, 197–200, 61 S.Ct. 845, 85 L.Ed. 1271; NLRB v. Armstrong Tire & Rubber Co., 5 Cir. 1959, 263 F.2d 680; NLRB v. Southern Silk Mills, 6 Cir. 1957, 242 F.2d 697. The details and relevant cases are set out extensively in Parker, Monetary Recovery Under the Federal Labor Statutes, 45 Texas L.Rev. 881, 887–92 (1967); see M. Forkosch, A Treatise on Labor Law § 524 (1965); W. Wilson, Labor Law Handbook § 309 (1963); 31 Am.Jur., Labor § 309 (1958). See also the district court's Memorandum and Order of March 20, 1967, part THIRD.

The appellant raises questions regarding employer contributions to the Seafarers Welfare Plan[25] and applicability of the backpay order to retired employees. The record has not been developed on these issues. Considering the lengthy litigation that has already taken place, we would hope that the parties would enter into a stipulation under the district court's order, as suggested in that court's earlier withdrawn Memorandum and Order of March 20, 1967.[26] If no such stipulation be filed, a master may be appointed under Fed.R.Civ.P. 53 to compute the back wages due after the district court has settled these remaining legal issues.

■ (4) Judge Friendly has written: "The effect of § 6 is to prolong agreements subject to its provisions regardless of what they say as to termination." Manning v. American Airlines, Inc., 2 Cir. 1964, 329 F.2d 32, 34. We quoted this language with approval in our first opinion on this case, 351 F.2d 183, 190, n. 26. The Union argues that this means that the backpay period extends beyond the termination date of the contract, September 30, 1964, up to the time the wrongfully discharged employees are reinstated pending bargaining. We agree.

Galveston contests this interpretation of *Manning*. In *Manning* there was a separate contract for the check-off of union dues of engineers who signed a prescribed authorization form. This check-off agreement was to continue in full force through April 30, 1963, "subject to renewal thereafter only by mutual agreement of the parties thereto." The Union gave notice that it desired the check-off dues on May 1. The district court ordered American to resume the check-off.

On appeal American argued that since the check-off agreement had a fixed termination date without self-renewal provisions, Section 6 was inapplicable. The Court replied:

> If the basic agreement of 1958 had no automatic renewal clause, § 6 would

---

23. See part (4) below.

24. This Court, following the lead of six other circuits, has approved the inclusion of interest on backpay awards. See NLRB v. George E. Light Boat Storage, Inc., 5 Cir. 1967, 373 F.2d 762, 766; see cases from other circuits cited 373 F.2d at 766 n. 4.

25. The district court did suggest that such contributions were not to be included

as sanctions, but in light of our decision on the backpay issue this observation must be reconsidered.

26. Cf. 29 C.F.R. § 102.52, suggesting that the amount of backpay due pursuant to a court decree or Board order under the National Labor Relations Act should "be resolved without a formal proceeding," that is, through settlement.

have nonetheless applied; unless the terms of the agreement were still to be followed there would be "an intended change," which would bring into play the thirty-day notice provision of § 6 and with the requirement of the second sentence that the *status quo* be maintained until compliance with all the demands of the section was had. The objective of the Railway Labor Act is continuance of the status quo until the statutory procedures of the Act have been exhausted.[27] This objective would be frustrated if the employer here could avail himself of the contract termination date where it is clear that the employer has not taken the mandatory step of bargaining with the Union on the issue of the contract's renewal. Similarly, the employees can be made whole only by a backpay order encompassing the time which they have been out of work because of the wrongful discharge by the Carrier. That time must be measured without regard to the termination date specified in the contract. As the Supreme Court stated in Order of Ry. Telegraphers v. Railway Express Agency, 1943, 321 U.S. 342, 347, 64 S.Ct. 582, 586, 88 L.Ed. 788, 792, "the failure of the carrier to proceed as provided by the Railway Labor Act of 1926, then applicable, leaves the collective agreement in force throughout."

The Carrier argues: "What the Court has said we did wrong was not bargaining with the Union with reference to leasing the Elevator. There can be no contention that we refused to bargain with the Union with reference to the expiration of the contract or the extension or rewriting of the contract." However, as we observed earlier, when the Union served notice requesting negotiation on the shut-down or leasing of the elevator, "The Carrier declined, replying that 'It is not possible to reopen the contract under the present conditions.'" 351 F.2d at 186. We cannot, and need not, guess what would have been the result of negotiations at that time. The effect of the Carrier's position was the discharge of employees without negotiations—negotiations required by federal statute. The unlawful discharge of the employees on July 30 did not somehow become lawful on September 30. By the Carrier's very actions, that later date becomes irrelevant; the point of focus required by the Railway Labor Act is the status quo *before* July 30.

NLRB v. George E. Light Boat Storage, Inc., 5 Cir. 1967, 373 F.2d 762, is inapposite. The issue in that case was whether the Company's overtime and welfare-payment obligations terminated with the expiration date of the contract, where the Company had refused to bargain concerning changes in wages and hours. The Court concluded that "the Company should be ordered to pay back overtime and back welfare fund payments only through the expiration date of the contract * .* *. Restoration of the status quo ante which the Act seeks requires no more." 373 F.2d at 771. The Court observed that the Company was almost out of business, and that "In such a situation there is no reasonable probability that had the company respected its statutory duty to bargain with the union, the contract taking effect in 1965 would have contained terms similar to or more favorable to the employees than those of the old contract." 373 F.2d at 770.

We recognize the analogy between the *Light Boat* case and this case in that in both there was only a slight likelihood that the bargaining that the employer refused to engage in would have resulted in continuance of the obligations that the Courts were later to enforce.[28] On the other hand, the Railway Labor Act is more concerned than the National Labor Relations Act with continuance of the employer's operations and the employer-employee relationship. This is evidenced

---

27. See Part IA above.

28. But note that the items in controversy in *Light Boat* were welfare and overtime payments, not backpay. The two employees discharged in violation of §§ 8(a) (1) and (3) were ordered reinstated with complete backpay. 373 F.2d at 766.

by the fact that while bargaining is the first and last step under the NLRA, it is only the first step under the Railway Labor Act in a ladder that leads to the White House if differences cannot be resolved.[29] The cases cited by the Carrier [30] holding that a court cannot extend or reinstate a contract or contract provision after termination of the contract are not controlling. Those cases arose under the NLRA. "[T]he fundamental premises and principles of the Railway Labor Act are not the same as those which form the basis of the National Labor Relations Act * * *." Brotherhood of R.R. Trainmen v. Chicago River & Ind. R.R., 1957, 353 U.S. 30, 31 n. 2, 77 S.Ct. 635, 636 n. 2, 1 L.Ed.2d 622, 624 n. 2. Under the NLRA a court simply cannot order compliance with an expired contract. See NLRB v. George E. Light Boat Storage, Inc., supra, 373 F.2d at 770. The Railway Labor Act specifies clearly:

> In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, *rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon*, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or

proffer of the services of the Mediation Board. 45 U.S.C. § 156.

The Act, therefore, provides explicitly for extension of the rates of pay, rules, and working conditions regardless of the termination date of the contract until *after* conference bargaining between the parties. None has yet occurred by the parties before us. The rates of pay, rules, and working conditions under the original contract thus still stand in theory. In actuality, they do not, since we have deemed it unnecessary to unscramble the lease that brought about the changes, backpay being a sufficient substitute; the backpay obligation of the Carrier must extend to when bargaining begins.

## II.

The district court enjoined the defendants from "enforcing, giving continued effect to or availing themselves in any manner whatsoever of the benefits of the state court injunction that was entered in the District Court of Galveston County, Texas, to enjoin the picketing by the members of the Union." The state court injunction was sought on the basis that the Union picketing would violate article 5154c of the Vernon's Ann. Texas Revised Civil Statutes, which makes illegal picketing to induce employees of a city or other political subdivision of the State of Texas to engage in strikes or organized work stoppages.[31]

---

29. We recognize that the national interest in operation of a grain elevator may be different from the interest in continuance of rail or air service, but the Act makes no such distinction.

30. NLRB v. Cosmopolitan Studio, Inc., 2 Cir. 1961, 291 F.2d 110; Hobar v. United Aircraft Corp., 63 L.R.R.M. 2081. Air Line Dispatchers Ass'n v. California Eastern Airways, Inc., N.D. Cal.1954, 127 F.Supp. 521, was a backpay minor-dispute case arising under the Railway Labor Act, and its statement, in a jurisdictional context, that the right extended only to the contract termination date is not here controlling.

31. Article 5154c provides: It is against state public policy for its officials or those of its political subdivisions to bargain on contract with a labor organization concerning terms and conditions of employment of its employees. Public employees are prohibited from participating in an organized work stoppage or strike under penalty of losing civil service and other rights acquired as a result of their public employment. Employees may individually work without penalty and may present their grievances through a representative that does not claim the right to strike. No person shall be denied public employment because of membership or non-membership in

We agree that Galveston should be enjoined, but we do not rely on that part of the court's reasoning which was grounded upon the applicability of the Norris-LaGuardia Act, 29 U.S.C. § 113, to the facts of this case. The City of Galveston, owner and operator of the elevator facilities, is a sovereign arm of the State of Texas and is therefore immune from the application of that Act.[32]

The ultimate issue, then, is the applicability of the anti-injunction statute, 28 U.S.C. § 2283, which provides:

> A Court of the United States may not grant an injunction to stay proceedings in a State Court as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

There is no Act of Congress authorizing the injunction in this case; nor is an injunction needed to aid federal court jurisdiction here. But we conclude that the injunction issued by the district court was proper to carry out that court's bargaining order.

Economic action after exhaustion of Section 6 procedures is an integral part of the collective bargaining scheme Congress prescribed when it enacted the Railway Labor Act. The effect of the state court injunction against a possible Union strike is perhaps to render impotent the duty to bargain imposed by this Court.[33] Texas and Texas courts may not agree with this view, but when the Railway Labor Act is otherwise applicable—as it is here—the Texas view is irrelevant. For the Railway Labor Act pre-empts all state legislation purporting to regulate the labor relations of covered employees.[34]

In State of California v. Taylor, 1957, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034, the Carrier, owned and operated

a union. The validity of this statute was upheld in South Atl. & Gulf Coast Dist. of International Longshoremen's Ass'n, v. Harris County-Houston Ship Channel Navigation Dist., Tex.Civ.App. 1962, 358 S.W.2d 658, writ. ref'd n. r. e., cert. denied, 372 U.S. 975, 83 S.Ct. 1111, 10 L.Ed.2d 142.

32. The district court, citing City of Galveston v. Posnainsky, 1884, 62 Tex. 118, observed that "the City of Galveston stands neither in the shoes of the sovereign as an agent of the State nor, certainly insofar as the operation of its railroad facility is concerned, is it performing a public service function." Thus, reasoned the court, Galveston is a person under the Norris-LaGuardia Act; the case grows out of a labor dispute as defined in that Act; and "No Court of the United States * * * shall have jurisdiction to issue any * * * injunction in a case involving or growing out of a labor dispute." 29 U.S.C. §§ 101, 113. Since the federal court could not issue an injunction against picketing in this case, concluded the court, neither can a state court. This entire theory is shattered by the simple observation that *Posnainsky* is no longer good law in Texas: a city in Texas is an arm of the State and is a political subdivision of the State. *City of Goose Creek v. Hunnicutt*, Tex.Comm'n App., 1931, 120 Tex. 471, 39 S.W.2d 617, opin-

ion adopted, accord, City of Longview v. First National Bank, 5 Cir. 1945, 152 F.2d 97, cert. denied, 327 U.S. 784, 66 S.Ct. 684, 90 L.Ed. 1011; Supreme Forrest Woodmen Circle v. City of Belton, 5 Cir. 1938, 100 F.2d 655; Town of Ascarte v. Villalobos, 1949, 148 Tex. 254, 223 S.W.2d 945; Texas National Guard Armory Bd. v. McCraw, 1939, 132 Tex. 613, 126 S.W. 2d 627.

33. Although not here applicable, the Norris-LaGuardia Act evidences Congressional belief in the freedom of either party to use self help after bargaining has failed.

34. For example, in the field of grievances —of minor disputes—neither a state nor a federal court has jurisdiction to determine matters of contract interpretation. Order of Ry. Conductors v. Southern Ry., 1950, 339 U.S. 255, 70 S.Ct. 585, 94 L.Ed. 811; Slocum v. Delaware, Lackawanna & W. R. R., 1950, 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795; Order of Ry. Conductors v. Pitney, 1946, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318. It is equally clear that federal, not state, law applies to awards of system boards of adjustment, which are enforceable only in federal courts. International Ass'n of Machinists v. Central Airlines, 1963, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed. 2d 67.

9

by the State of California, contended that the minor disputes provisions of the Railway Labor Act were inapplicable to it and that its labor relations were specifically regulated under state statute. The Supreme Court replied:

Under the Railway Labor Act, not only would the employees of the Belt Railroad have a federally protected right to bargain collectively with their employer, but the terms of the collective-bargaining agreement that they have negotiated with the Belt Railroad would take precedence over conflicting provisions of the state civil service laws. 353 U.S. at 561, 77 S.Ct. at 1042, 1 L.Ed.2d at 1039.

The Court squarely held that the Railway Labor Act applied to state-owned carriers. Said the Court: "The fact that, under state law the employees of the Belt Railroad may have no legal right to strike reduces, but does not eliminate, the possibility of a work stoppage. It was to meet such a possibility that the act's 'reign of law' was established.". 353 U.S. at 566, 77 S.Ct. at 1045, 1 L.Ed.2d at 1042.

Galveston relies upon Amalgamated Clothing Workers v. Richman Bros., 1955, 348 U.S. 511, 75 S.Ct. 452, 99 L.Ed. 600. The Court in that case, however, specifically recognized that "In no lawyer-like sense can the present proceeding be thought to be in aid of the District Court's jurisdiction." 348 U.S. at 519, 75 S.Ct. at 457, 99 L.Ed. at 609. The district court simply did not have jurisdiction over the matter in controversy; it had remanded the state cause when first removed to federal court. The court's non-existent jurisdiction therefore cannot be aided. Ibid.

More in point is Capital Service, Inc. v. NLRB, 1954, 347 U.S. 501, 74 S.Ct. 699, 98 L.Ed. 887, a leading case on the "in aid of jurisdiction" exception. A state court had enjoined all picketing arising from a labor dispute; the federal court enjoined only that which violated the National Labor Relations Act. The Board, to cure the conflict and enforce the injunction obtained pursuant to Section 10(1) of the Act, moved to enjoin the employer from giving effect to the state court order. The district court granted the stay as necessary in "aid of its jurisdiction." The Supreme Court granted relief under Section 2283, observing that the federal court must " * * * have unfettered power to decide for or against the Union, and to write such decree as it deemed necessary in order to effectuate the policies of the Act * * *. [To do so] it must be freed of all restraints from the other tribunal." 347 U.S. at 505, 506, 74 S.Ct. at 702–703, 98 L.Ed. at 892.

In NLRB v. Schertzer, 2 Cir. 1966, 360 F.2d 152, the National Labor Relations Board had ordered an employer to pay back wages to an employee in settlement of an unfair labor practice dispute. After the Board issued its order, a creditor of the employee instituted garnishment proceedings in state court and named the employer as garnishee. The Board then sought enforcement of the backpay order in the Court of Appeals, despite the employer's willingness to comply with the order. The Second Circuit granted a stay of the state court proceedings. The Court held that it had the power to enjoin the state court under section 2283 "in aid of its jurisdiction" and "to protect and effect its judgments." A commentator suggests that pre-emption supplied a third and better reason for the federal injunction: the rule that emerges from *Richman* is that when national labor policy is adversely affected by a state proceeding threatening the jurisdiction of the federal court, the federal court may enjoin the state court proceeding. See Comment, Enjoining State Court Proceedings Which Interfere with National Labor Policy, 115 Pa.L.Rev. 590 (1966).

The state court injunction, issued August 11, 1964, enjoined the Union from "picketing the properties of the Galveston Wharves at Galveston," excluding the situs of the Elevator (which apparently was closed anyway). This was at a time when the Carrier itself was in violation of the Railway Labor Act. The cases

suggest that at that time, under the Act, the Union had the right to strike; that right continues until the Act is complied with by the Carrier, and thereafter ceases during and until exhaustion of the procedures set up by the Act.[35]

After discussing the history of and procedures set up in the Railway Labor Act, the Supreme Court, in Elgin, Joliet & E. R.R. v. Burley, 1945, 325 U.S. 711, 725, 65 S.Ct. 1282, 1291, 89 L.Ed. 1887, 1895, said: [C]ompulsions go only to insure that those procedures are exhausted before resort can be had to self-help." This position, approved by the commentators,[36] reflects the conclusion of the district court in a case concerning precisely this problem. American Airlines, Inc. v. Air Line Pilots Ass'n, S.D. N.Y.1958, 169 F.Supp. 777. The Union, following extensive proceedings between the Company and the Union—including conferences, mediation by the National Mediation Board, proffer and refusal of arbitration, and a report and recommendations by a Presidential Emergency Board, struck and the Company immediately went to the district court for an injunction. The court concluded that the Company had not established noncompliance with the provisions of the Act by the Union, and denied relief.

After a review of the case history and the Act, the court observed that

> whereas in the case of minor disputes strikes are illegal *per se* because the processes of the Act are final, binding and conclusive throughout and therefore can be enjoined despite Norris-La-Guardia, in the case of a major dispute a strike is not illegal *per se* and cannot be enjoined if the processes of

the Railway Labor Act have been complied with and exhausted. 169 F.Supp. at 787.

The court concluded that "the parties may not, in the course of a major dispute under the Railway Labor Act, have resort to either the strike or the lockout before the proceedings provided by the Act have been exhausted", 169 F.Supp. at 789, and that because the Union "had performed its duties and obligations under the Railway Labor Act. * * * there was nothing to bar a strike." 169 F.Supp. at 798.

In *American Airlines* the parties had completed proceedings under the Act; here the parties have not begun them. But in both cases the Union did all it could to exhaust the procedures of the Act, and that is all that is necessary. One commentator has urged an even broader reading of the statute, suggesting that under the literal provisions of the Act the Union may strike even without having exhausted the procedures under the Act. For *American Airlines* "did not consider the fact that § 6 applies only to carriers and the sections that could be applied to unions only operate after the conciliatory and mediatory proceedings have failed and the procedures for bringing public opinion to bear on the problem have been initiated. Furthermore, it seems to strain the language of the act to say that the prohibition against changing 'working conditions or established practices,' in § 6, and 'conditions out of which the dispute arose,' in § 10, have reference to strikes."[37] Comment, Enjoining Strikes

---

**35.** See Butte, Anaconda & Pac. Ry. v. Brotherhood of Locomotive Firemen, 9 Cir. 1959, 268 F.2d 54, cert. denied 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed.2d 104; Brotherhood of R. R. Trainmen v. New York Cent. R. R., 6 Cir. 1957, 246 F.2d 114, cert. denied, 355 U.S. 877, 78 S.Ct. 140, 2 L.Ed.2d 107.

**36.** See Wisehart, The Airlines' Recent Experience Under the Railway Labor Act, 25 Law & Contemp.Probs. 22, 28

(1960); Comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 60 Colum.L. Rev. 381, 386–89 (1960).

**37.** But see U.S. Emergency Board No. 97, Report to the President 138 (1952), asserting that a work stoppage is prohibited "for a period of 30 days following the date when * * * [an emergency board] is appointed."

and Maintaining the Status Quo in Railway Labor Disputes, 60 Colum.L.Rev. 381, 389 n. 51 (1960).

While the other cases dealing with the issue of the propriety of strikes during a major dispute under the Railway Labor Act suggests no clear solution, they appear consistent with *American Airlines*. Railroad Yardmasters v. Pennsylvania R.R., 3 Cir. 1955, 224 F.2d 226, held that the Carrier may unilaterally change working conditions only if it has complied with the Act. And Missouri-Illinois R.R. v. Order of Ry. Conductors and Brakemen, 8 Cir. 1963, 322 F.2d 793, 796, held that no injunction will lie against a Union strike unless the Union has "violated the provisions of the Railway Labor Act," that is, that the Union may strike only if it has complied with the Act. Finally, in a dissenting opinion Judge (now Mr. Justice) Marshall adopted the position that "the conduct of both parties in derogation of the major dispute procedures must be enjoined" * * "on the grounds that resort to the courts is generally preferable to this kind of self help and on the further grounds that the 'cooling off' policies of the major dispute procedures cannot be effectuated by allowing both parties simply to do away with the Act." Rutland Ry. v. Brotherhood of Locomotive Engrs., 2 Cir. 1962, 307 F.2d 21, 45.

It must be kept in mind that

[t]here is no compulsion on the parties to agree at any stage of the procedure. They are not compelled to reach an agreement by collective bargaining, to follow the recommendations of the Mediation Board, to submit to arbitration or to follow any recommendations which a Presidential Emergency Board may make.

American Airlines, Inc. v. Air Line Pilots Ass'n, supra, 169 F.Supp. at 784.

Similarly, the parties may not want the services of the National Mediation Board, and the Board may not proffer its services. If the carrier refuses to follow the procedures of the Act, or if those procedures are followed to an impasse, the Union may strike. The Union's right to bargain, guaranteed by the Act, 45 U.S.C. § 152, Fourth, and presently enforced by this Court, would be illusory without a right to strike when bargaining has run its course if the Carrier continues to refuse to bargain. The Railway Labor Act, and the cases interpreting it, only forbid Union striking during the course of exhaustion of the Act's procedures (and during the statutory cooling-off periods after initiation of the proceedings, for 30 days after mediatory efforts have failed, and after creation of an Emergency Board and thirty days thereafter). The right to strike is adjunct to the Union's statutory rights and implicit in our order. This national labor policy cannot be frustrated by a state court injunction. To effectuate the judgment of the federal court, the district court properly enjoined the Carrier from availing itself of the state court injunction. If the Union is to be enjoined from picketing in the future, it must be enjoined under the Railway Labor Act, not under article 5154c of the Texas statutes; and it is to be enjoined in federal, not state, court.

The district court's judgment is affirmed in part and reversed in part, and the cause is remanded to the district court for further proceedings consistent with this opinion.